CROMER FINANCE LTD. and Prival N.V., et al., Plaintiffs,

v.

Michael BERGER, Fund Administration Services (Bermuda) Ltd., Ernst & Young International, Ernst & Young Bermuda, Kempe & Whittle Associates Limited, Deloitte & Touche (Bermuda), Deloitte Touche Tohmatsu, Deloitte & Touche L.L.P., Bear Stearns & Co., Inc., Bear Stearns Securities Corp., Financial Asset Management, Inc., and John Does 1–100, Defendants.

No. 00 CIV 2284 (DLC).

United States District Court, S.D. New York.

Dec. 27, 2001.

Steven S. Honigman, Richard P. Swanson, Jonathan E. Polonsky, Veronica E. Rendon, Thelen Reid & Priest LLP, New York City, Jeffrey H. Squire, Richard L. Stone, Mark A. Strauss, Kirby, McInerney & Squire LLP, New York City, for Cromer Finance, Ltd., et al.

Robert E. Juceam, Gregg L. Weiner, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Ernst & Young Bermuda, Fund Administration Services (Bermuda) Ltd., and Kempe & Whittle Associates Limited.

Michael J. Dell, Kramer Levin Naftalis & Frankel LLP, New York City, for Deloitte & Touche Bermuda.

Martin I. Kaminsky, Edward T. McDermott, Pollack & Kaminsky, New York City, for Financial Asset Management, Inc.

Michael Berger, West Hampton Beach, NY, pro se.

## OPINION AND ORDER

COTE, District Judge.

The plaintiffs in this federal securities fraud action have moved to certify as a class certain investors in the Manhattan Investment Fund, Ltd. (the "Fund"). The Fund was an offshore investment fund operated from New York by defendant Michael Berger ("Berger"). The plaintiffs allege that the class lost hundreds of millions of dollars over the course of several years due to the scheme Berger concocted. Instead of accurately reporting the Fund's losses, the plaintiffs allege that Berger manufactured false statements showing the Fund to be profitable. It is alleged that the Fund's trading strategy, which principally involved shorting United States technology stocks, was unprofitable essentially from the outset. Berger has entered a plea of guilty in the Southern District of New York to criminal charges stemming from his management of the Fund.[1]

The motion to certify has been resisted by the Bermuda accounting firms ("Bermuda Defendants") that served as the Fund's administrators and auditor. Kempe & Whittle Associates Limited ("K & W") served as the administrator between September 1, 1995 and February 1, 1997, when it was replaced by its affiliate Fund Administration Services (Bermuda), Ltd. ("FASB"). These two entities and Ernst & Young Bermuda ("EYB"), which is alleged to have controlled K & W and FASB, are collectively referred to here as "Ernst & Young." It is alleged that Ernst & Young calculated and distributed false net asset value ("NAV") statements to investors monthly, issued new shares to investors and redeemed the shares of exiting investors at inflated NAVs, and disseminated the Fund's Offering Memorandum ("Offer Memo"), containing fraudulent performance data, to prospective investors. Ernst & Young advised the Court on December 21, 2001, that it had reached a settlement in principle with the plaintiffs, which contemplates the Court's approval of a class action for settlement purposes. As a consequence, Ernst & Young has withdrawn its opposition to the motion for class certification, and the only defendant now resisting the plaintiffs' motion to certify a class action is the Fund's auditor.[2]

Deloitte & Touche Bermuda ("Deloitte") was the Fund's auditor. As for Deloitte's role, it is alleged that Deloitte's annual audits certified the year-end NAV, when Deloitte had access to information demonstrating that the NAV calculations were based on fictitious information. Deloitte contests the appropriateness of a class action on a variety of

---

1. On September 24, 2001, Berger filed a motion to withdraw his guilty plea.

2. Despite the settlement, this Opinion addresses the arguments made by Ernst & Young against class certification as well as those made by the Fund's auditor. A settlement had not been reached at the time the parties briefed this motion, and all of the Bermuda Defendants relied upon and incorporated each others' arguments.

grounds, but places particular emphasis on its arguments (1) that each investor must prove its own reliance, and as a result, that individualized issues will predominate over any common issues in this case, and (2) that the two named plaintiffs are not appropriate class representatives.

This action, which is referred to as the *Cromer* action, was filed on March 24, 2000. The two law firms representing the *Cromer* plaintiffs have been retained by investors who lost something over half of the approximately $394 million[3] which was invested in the Fund and lost. A companion case in this Court, filed on April 3, 2000, against essentially the same defendants, is referred to as the *Argos* action. The 30 or so Fund shareholders who filed the *Argos* action and who account for approximately $96 million or roughly one-quarter of the Fund's losses, are represented by a third law firm, and do not at present seek to join the *Cromer* class action. Discovery and pretrial motion practice in the two actions have been coordinated. Only one other Fund investor has separately filed suit against essentially the same defendants who are named in this action. Scotia Nominees, which seeks to recover a $5 million investment or just over 1% of the Fund's losses, filed suit in New York State Supreme Court on January 25, 2000, asserting common law claims exclusively. Discovery in the *Scotia* action is being coordinated with that in the two federal actions through a Coordination and Pretrial Discovery Order of June 6, 2001. At present, therefore, investors who

suffered approximately one-fifth of the losses have not filed any separate action.[4]

The parties have essentially completed document discovery and are poised to begin depositions. Pursuant to a request by the Bermuda Defendants, a stay of discovery was entered on August 2, 2001, so that the remainder of discovery could be informed by the conclusions reached in this Opinion and on a third round of motions to dismiss. That most recent set of motions to dismiss was resolved in an Opinion rendered on September 19. The first round of motions to dismiss, which followed jurisdictional discovery, was resolved in an Opinion and Order of April 17, 2001 ("April 17 Opinion"), familiarity with which is assumed. *Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452 (S.D.N.Y. 2001).[5]

The plaintiffs have moved to certify a class of all persons who purchased shares of the Fund and suffered damages thereby (the "Class"), during the period commencing October 1, 1995, and continuing through January 18, 2000, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. For the reasons discussed below, including the fact that a presumption of reliance is properly applied in this litigation, and as a consequence because it has been shown that common issues will predominate over individual ones, the motion to certify a class is granted.[6]

### STANDARD

A decision on class status should be made "as soon as practicable after the com-

---

3. Approximately $592.8 million was invested in the Fund over its lifetime. Approximately $143.1 million was paid out to investors who redeemed their shares before the Fund collapsed, $20 million was paid to Berger's company, Manhattan Capital Management; and $36.5 million remained on the day the Fund's assets were frozen.

 The $394 million loss figure does not include individual proprietary claims that have been filed by fifteen "shareholders" against FASB as well as Berger and others, that are pending in Bermuda and amount to approximately $20 million. The proprietary claims are filed by the last investors in the Fund, who claim a priority in recovery of the Fund's assets because they rescinded their purchases before they received any shares and before their money was invested.

4. The Bank of Austria has filed an action in New York State Court against Berger but not against Deloitte. That action is currently stayed.

5. Opinions have also been issued denying reconsideration of the April 17 Opinion, denying the motion by the Bermuda Defendants to certify an interlocutory appeal from the April 17 Opinion, denying the motion by the Bermuda Defendants to dismiss the *Cromer* and *Argos* actions on the ground of *forum non conveniens*, and denying the motion to certify an interlocutory appeal from the *forum non conveniens* Opinion.

6. If it is later determined that common issues do not predominate over individual-specific issues, certification of a class would still be appropriate for many issues in this case. *See Robinson v. Metro–North Commuter Railroad Co.*, 267 F.3d 147, 167 n. 12 (2d Cir.2001).

mencement of an action," Fed.R.Civ.P. 23(c)(1), so that defendants may "be told promptly the number of parties to whom [they] may ultimately be liable for money damages." *Siskind v. The Sperry Retirement Program, Unisys,* 47 F.3d 498, 503, (2d Cir.1995). In reviewing a motion for class certification, the question is not whether the plaintiff has "stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (citation omitted). The plaintiff bears the burden of establishing the requirements of Rule 23, Fed.R.Civ.P. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Caridad v. Metro–North Commuter Railroad,* 191 F.3d 283, 291 (2d Cir.1999). A court may certify a class only if it is satisfied after a "rigorous analysis" that the Rule 23 requisites have been satisfied; however, it should not conduct a "preliminary inquiry into the merits" of the action. *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Visa Check/Mastermoney Antitrust Litig.,* 280 F.3d 124, 134 (2d Cir.2001).

The four prerequisites set forth in Rule 23(a) are as follows:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

In addition, the plaintiffs must establish in this case that a class action may be maintained under Rule 23(b), which requires a finding "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Fed.R.Civ.P. A Rule 23(b)(3) action is "designed to secure judg-

ments binding all class members save those who affirmatively elect[ ] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products,* 521 U.S. at 614–15, 117 S.Ct. 2231 (citation omitted). A court must take a "close look" at each of the criteria for a Rule 23(b)(3) action. *Id.* at 615, 117 S.Ct. 2231.

## DISCUSSION

### *The Rule 23(a) Prerequisites*

A. *Numerosity*

■ To show that the class is so numerous that joinder is "impracticable," a plaintiff is not required to show that joinder is "impossible." *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). While satisfaction of the numerosity requirement is presumed at a level of forty class members, *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995), the practicality of joining all class members should not be determined by resort to numbers alone, but should also include consideration of any "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux,* 987 F.2d at 936. In *Primavera Familienstiftung v. Askin,* 178 F.R.D. 405 (S.D.N.Y.1998), the court expanded the above list with the following additions: the amount of each member's individual claim; knowledge of the names and existence of the potential class members; and whether potential class members have already joined other actions. *Id.* at 410.

It is undisputed that the members of the putative class number in excess of 40. The plaintiffs have pleaded that there were over 200 investors of record and over 1000 beneficial owners in the Fund as of January 2000, when the fraud was unmasked. The Bermuda Defendants calculate that the number of record holders not committed to either the

*Argos* or *Scotia* actions may be as low as 126.[7] Ernst & Young arrives at a number of 126 by subtracting from 294 numbered investor accounts: six accounts that were created but never used; 30 accounts that transferred all of their shares to other accounts within the Fund; 42 second accounts for Fund investors;[8] 55 investors whose investments were fully redeemed; three accounts that invested before the first audit was issued and never invested again; and the plaintiffs in the *Argos* and *Scotia* actions. The Bermuda Defendants do not provide an estimate of the number of beneficial owners.

Deloitte speculates that it may be appropriate to exclude Fund investors from the class if, for example, there are any who purchased their first shares after the issuance of Deloitte's last audit report, or violated the laws of their respective foreign countries of origin by investing in the Fund, or never read Deloitte's audit reports, or were insiders. Many of these proffered grounds for shrinking the class size are based on questionable legal and factual premises. For example, Deloitte argues that those who made their first investment after its last audit cannot bring a claim against it because its audit is addressed to and only intended for "shareholders." Those who became shareholders after an audit was issued, but in reliance on the audit, can bring claims against Deloitte. Deloitte's duties under the federal securities laws extended not only to those who were shareholders on the date the audit was issued, but to all investors who relied on the audit in making their decision to invest.[9]

Several of the relevant factors in addition to the raw number of investors favor a finding that joinder is impractical. Separate actions by each investor or even a multitude of joinder actions would substantially increase the burden on the parties and courts. The plaintiffs are widely dispersed. While there is debate as to whether any reside in this country, it is undisputed that many reside in different nations in Europe and the Caribbean. While approximately 30 potential class members have joined two other actions—one in federal court and one in state court—the remaining investors appear to have decided to litigate their claims through this class action. As noted, plaintiffs' counsel in the class action already represent those investors accounting for over half of the Fund's losses.

Balanced against a finding of numerosity are several other factors. Many of the class members are substantial institutions or partnerships that can afford to litigate in the absence of a class action, and the size of the losses here, at least in some instances, should provide a sufficient incentive to do so. The minimum investment in the Fund for record holders was $250,000, and defendants allege that the average investment for record holders was well over $1 million. There is no request here for injunctive relief. Finally, the identities of record holders, if not beneficial owners, are known, and a substantial number of them have already retained the counsel for the plaintiffs in the *Cromer* action.

On balance, the plaintiffs have shown that the class is so numerous that joinder is impracticable. There are, at a minimum, over 100 class members. Given the highly contentious nature of this lawsuit (with five separate substantive motions filed by Deloitte to date) and discovery requiring depositions around the world,[10] only wealthy investors with substantial losses will be in a position to fund litigation against Deloitte.[11]

---

7. The Bermuda Defendants argue, unpersuasively, that the number of class members may be as few as 88 when the 36 investors who partially redeemed their shares are excluded. This group should not be excluded from the class.

8. The plaintiffs contend these 42 accounts should not be subtracted since they reflect different sets of beneficial owners.

9. When parsed, Deloitte appears to be arguing that the only investor to whom it is liable is one whose investments straddled a Deloitte audit, that is, one who was already an investor before the audit but who also made an additional investment after the audit, in reliance on that audit.

10. For example, several of the employees of the Bermuda Defendants who worked on the Fund are now employed elsewhere and have left Bermuda.

11. Even a loss of $1 million might not provide a sufficient incentive to litigate in the way necessary to obtain the maximum recovery. Deloitte represents that it intends to pursue a "vigorous"

The reliance by the Bermuda Defendants on *Primavera, supra,* 178 F.R.D. 405, is misplaced. In *Primavera,* the court denied plaintiffs' class certification motion because, among other reasons, it was already too late to avoid a multiplicity of actions: five actions had already been filed; and the potential class consisted of only 38 to 40 plaintiffs.[12] *Id.* at 410–11. The class at issue here is significantly larger than the potential class in *Primavera,* and most class members appear committed to remaining part of this class action. The class action here was filed promptly as the preferred vehicle to press claims for a majority of the shareholders, and not as the last in a string of lawsuits, as was the case in *Primavera.*

### B. *Commonality*

██ Rule 23(a) mandates that there be an issue of law or fact common to the class. *Robinson,* 267 F.3d at 155; *In re Agent Orange Product Liability Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987); *Marisol v. Giuliani,* 929 F.Supp. 662, 690 (S.D.N.Y.1996) (collecting cases), *aff'd,* 126 F.3d 372 (2d Cir. 1997). Plaintiffs' allegations of common questions satisfy this burden.

Plaintiffs identify as some of the "questions of law or fact common to the class" the following: whether Ernst & Young reported to investors materially misleading NAVs; whether the audited financial statements prepared by Deloitte materially misrepresented the Fund's financial condition and results; whether Deloitte acted with knowledge of falsity or reckless disregard for the truth; whether Deloitte substantially assisted in Berger's fraud; and whether Deloitte was grossly negligent in the performance of its professional and contractual responsibilities.

### C. *Typicality*

██ The requirements of commonality and typicality "tend to merge into one another." *Marisol v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997). While the commonality inqui-

ry asks if the named plaintiffs' "grievances share a common question of law or of fact" with those of the proposed class, *id.,* the focus of the typicality inquiry concerns whether "each class member's claim arises from the same course of events, and [whether] each class member makes similar legal arguments to prove the defendant's liability." *Robinson,* 267 F.3d at 155 (citation omitted). *See also In re Drexel Burnham Lambert Group,* 960 F.2d 285, 291 (2d Cir.1992). Typicality does not require that "the factual background of each named plaintiff's claim be identical to that of all class members," so long as "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad,* 191 F.3d at 293 (citation omitted). The purpose of both the typicality and commonality requirements is to ensure that "maintenance of a class action is economical and that the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

The alleged common course of conduct by Deloitte which involved the confirmation through audits of fraudulent NAVs is central to the claims of the class and its named representatives. The class and its representatives will also necessarily rely on similar legal arguments to prove those claims.

Nonetheless, Deloitte argues that the claims brought by the named plaintiffs are not typical of those pressed on behalf of the class. First, relying on portions of the deposition testimony of the named plaintiffs, it argues that the named plaintiffs do not wish to pursue "fraud" claims against Deloitte although the complaint contains both securities fraud and common law fraud claims. This is sophistry. The action against Deloitte is *not* premised on a theory that it was engaged over a multi-year period in a conspiracy with Berger to defraud investors. The allegations

---

and "detailed" defense against "each investor's" claims.

**12.** The plaintiffs in *Primavera* argued that the class had 57 to 77 members, while the defen-

dants argued it had 38. *Primavera,* 178 F.R.D. at 411 n. 5. From either perspective it was substantially smaller than the numbers the parties describe here.

of scienter are more nuanced and include the reckless disregard of evidence of the fraud. The depositions, when read in their entirety, do not suggest that the named plaintiffs' lay understanding of their own claims provides a basis to believe those claims are not typical of the class's claims. They relied, as they are entitled to do, on their attorneys to articulate the American legal theories that apply to their claims.

Deloitte also argues that it has numerous defenses against the named plaintiffs that are not necessarily applicable to the class as a whole. The unique defenses that Deloitte asserts apply against the named plaintiffs may be reduced to the following: their individual strategies for and purposes in investing in the Fund, their possible lack of reliance on information provided by Deloitte, and their possible reliance on other information. Deloitte does not, and could not credibly, contend that any investor, much less the named plaintiffs, decided to invest in the Fund although aware that its investment would be represented at an NAV that was not based on the actual assets of the Fund, or that that fact was not material to its investment decisions. When a defense that is unique to a class representative threatens to dominate or even interfere with that plaintiff's ability to press the claims common to the class, then that threat must be analyzed with care. Deloitte has not identified the presence of any realistic threat here.

D. *Adequacy of Representation*

A class representative must "possess the same interest and suffer the same injury as the class members." *Amchem Products*, 521 U.S. at 625–26, 117 S.Ct. 2231 (citation omitted). "[A]dequacy of representation entails inquiry as to whether: 1) plaintiff[s'] interests are antagonistic to the interest of other members of the class and 2) plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.2000). *See also In re Visa Check/Mastermoney*, 280

F.3d at 142; *In re Drexel Burnham*, 960 F.2d at 291.

Deloitte does not contest that plaintiffs' counsel have the qualifications, ability and experience to conduct this litigation with appropriate skill. It does claim, however, that the named plaintiffs are inadequate class representatives. The proposed class representatives are Cromer Finance Ltd. ("Cromer") and Prival N.V. ("Prival").

Cromer is a British Virgin Islands registered investment corporation established in 1997, for the purpose of investing in hedge funds. Cromer first invested in the Fund, after solicitation by its New York investment advisor in 1998, and subsequently increased its investment in four increments. Cromer's total investment in the Fund reached $3,250,000. Cromer director Thomas Hackl ("Hackl") was deposed by the Bermuda Defendants in connection with Cromer's investment in the Fund and role in this action.[13] As the head of Cromer's treasury and investment banking functions, Hackl is responsible for making decisions as to whether to make or redeem an investment, and made those decisions regarding Cromer's investment in the Fund. He has been with Cromer from the time of its creation. Hackl testified that Cromer invests in roughly 15 to 20 funds per year, and that he is a "sophisticated" investor, having a degree in economics and having worked in derivative trading with one German bank for four years, and at a second German bank since 1991.

Prival is a Netherlands Antilles offshore corporation, owned by a Cayman Islands offshore company. Prival made two investments in the Fund in 1999, totaling $600,000. Rolf Meijer–Werner ("Meijer–Werner") was deposed by the Bermuda Defendants in connection with Prival's investment in the Fund and its role in this action. Meijer–Werner is an experienced investor who holds a general power of attorney for Prival. He has been employed by various trading companies since 1957, and he directed Prival's purchases of

13. The Court allowed the Bermuda Defendants to depose representatives of the two named plaintiffs in connection with this motion to certify the class, but limited each deposition to seven

hours. This limitation, which Deloitte has protested, has not prevented Deloitte from making an extensive attack on the adequacy of representation provided by these class representatives.

shares in the Fund, the first of which was made in April 1999. He serves on two important committees in connection with the Fund's insolvency: the United States Bankruptcy Creditors Committee and the Committee of Inspection for the Bermuda/BVI Liquidation.

Both Hackl and Meijer–Werner have displayed knowledge sufficient to qualify them as adequate class representatives. They have also stated their willingness to act as class representatives, and have actively participated in the already extensive discovery process. Deloitte argues that Cromer has not displayed the concern for the absent class members befitting a plaintiff in a fiduciary role. See Martens v. Thomann, 273 F.3d 159, at 173 n. 10 (2d Cir.2001). At his deposition, Hackl admitted that he had not contacted any other investor and had not attended the shareholder meetings that were held in early 2000. Nonetheless, it is clear from his testimony that Hackl understands his role as class representative, and is willing to perform that role. Deloitte does not dispute the adequacy of Meijer–Werner's fiduciary concern for the absent class members.

■ Deloitte also argues that the named plaintiffs lack sufficient knowledge of the issues at stake in the litigation. The Supreme Court has "expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." Baffa, 222 F.3d 52 at 61 (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370–74, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966)). Class representatives are inadequate in this regard only when they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Id. (citation omitted). In Baffa, the court emphasized that the knowledge requirement for class representatives should be applied "with a view toward typicality concerns," and not with a "myopic view." Id.

■ The attack based on the representatives' purported lack of knowledge centers around their alleged inability to describe the legal claims asserted against particular defendants, as well as their lack of familiarity

with the other lawsuits that have been filed concerning the Fund. While the named plaintiffs were not wholly familiar with American legal terminology or concepts, their deposition testimony showed that they are more than sufficiently aware of the essential facts and issues in this case. In complex actions such as this one, particularly where class members include many foreign investors, it is unfair to expect plaintiffs, even when they are "sophisticated," to have an expertise in United States law. The plaintiffs are entitled to rely in that regard "on the expertise of counsel." County of Suffolk v. Long Island Lighting Co., 710 F.Supp. 1407, 1416 (E.D.N.Y.1989) (citation omitted). The named plaintiffs in this action stand in stark contrast to those courts have found inadequate based on lack of knowledge. See, e.g., Beck v. Status Game Corp., No. 89 Civ. 2923(DNE), 1995 WL 422067, at *7 (S.D.N.Y. July 14, 1995) (class representatives were uncertain of how they came to be named as such or had no discussions with class attorneys until two years after the complaint was filed).

Nor is this a case where there is any legitimate concern that attorneys rather than the named plaintiffs are "driving" the litigation. See Berger v. Compaq Computer Corp., 257 F.3d 475, 484 (5th Cir.2001). It is undisputed here that Berger designed a massive fraud that resulted in close to $400 million in losses to investors; that each of the named plaintiffs was among those who suffered substantial losses; and that each of them is sophisticated. In addition to being responsible for, informed about, and attentive to this litigation, the class representatives need not also be "legal scholars." Id. at 483.

■ Deloitte also argues that the named plaintiffs are not adequate class representatives because they lack credibility. It is appropriate to consider the "honesty and trustworthiness" of class representatives. Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir.1998). Courts have denied class certification based on the lack of credibility of the proposed class representatives where class representatives "are so lacking in credibility that they are likely to harm their case."

*In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 47 (E.D.N.Y.1997) (citing *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated on other grounds,* 458 U.S. 1105, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982)). Where a plaintiff's testimony on an "issue critical to" the cause of action was "subject to sharp attack," that deficiency has also rendered the plaintiff an inadequate class representative. *Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir. 1983). For instance, the plaintiff's lack of credibility made the plaintiff an inadequate class representative where the plaintiff had given "no less than four versions of her conversation with her broker," *Panzirer,* 663 F.2d at 368, "repeatedly changed his position .... about letters that form the very basis of his lawsuit," *Savino,* 164 F.3d at 87, or changed his testimony regarding an issue central to the action at least four times, *Darvin v. Int'l Harvester ·Co.,* 610 F.Supp. 255, 257 (S.D.N.Y.1985). Whenever a class representative is "subject to unique defenses that threaten to become the focus of the litigation," that person is no longer an appropriate representative for the class. *Gary Plastic Packaging v. Merrill Lynch,* 903 F.2d 176, 180 (2d Cir.1990).

Deloitte argues that the ability of Hackl and Meijer–Werner to serve as class representatives is undermined by the number of times they contradicted themselves during their depositions. The "contradictions" to which Deloitte points were due largely to the repeated questioning about distant events that neither Hackl nor Meijer–Werner was able to recall in detail. Any "inconsistencies" in response to the multitude of questions that they were asked do not, when the depositions are considered as a whole, present a fair basis to argue that they lied during their depositions or should be disqualified from serving as class representatives because their credibility at trial will be seriously undercut by their deposition testimony.

■ There is only one issue concerning credibility that deserves more extended discussion. Deloitte alleges that Meijer–Werner fabricated testimony in an attempt to

state a claim against it when he claimed to have seen a Deloitte audit report before the report was actually distributed. Meijer–Werner described seeing an audit report for the Fund during an April 1999 visit to Berger's offices and testified that the report, which he believed was an audit for the year 1998 reflecting a year-end NAV of roughly 160, was important to his decision to invest Prival's assets in the Fund. Meijer–Werner then identified the 1998 audit as the document he had seen. The 1998 audit, however, may not have been distributed until June 1999, that is, two months after the April visit. If Meijer–Werner's recollection proves to be in error, there may be explanations for that error other than deliberate fabrication.[14] This attack on his credibility is not sufficient to bar Meijer–Werner as an adequate class representative.

■ Deloitte also argues that for two separate reasons Cromer and Prival lack standing to assert claims on behalf of the class. *See Martens,* 273 F.3d 159, at 173 n. 10. First, it contends they cannot represent those that invested in the Fund after the dates on which these two representatives made their last investments, on October 1, 1999 and August 2, 1999, respectively. This argument is groundless. Deloitte relies on *Adair v. Sorenson,* 134 F.R.D. 13, 16 (D.Mass.1991), and *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1126–27 (D.Del.1988), both of which stand for the unexceptional proposition that a class representative cannot assert claims on behalf of absent class members if those claims are based on misrepresentations made after the class representative's investment. Here, an ongoing scheme of material misrepresentations is alleged and each class representative made investments after the scheme was underway. In any event, both named plaintiffs made additional investments after the issuance of Deloitte's final audit report.

■ Deloitte argues that the named plaintiffs also lack standing to assert the

---

**14.** Explanations for any error include confusion about the precise document shown to him in April.

class claims because they are both foreign investors. Deloitte contends that there is no personal jurisdiction over it for claims brought by foreign investors. This is a thinly disguised effort to reargue again this Court's ruling that there is personal jurisdiction over Deloitte under the Due Process Clause. To support its most recent iteration of this argument, Deloitte cites for the first time *Chew v. Dietrich*, 143 F.3d 24 (2d Cir. 1998).

In *Chew*, the Second Circuit found that the exercise of personal jurisdiction over a German national in an action brought under the Jones Act and federal maritime law for a death on the high seas did not offend the Due Process Clause since that defendant could reasonably anticipate being haled into court in the United States to respond to a suit brought on behalf of a crew member recruited to serve on the defendant's boat during a round-trip voyage from the United States.[15] *Id.* at 30. Similarly, as described in the April 17 Opinion, the exercise of jurisdiction over Deloitte in this federal securities fraud action does not offend traditional notions of either fair play or substantial justice. *Cromer*, 137 F.Supp.2d at 490–91. This conclusion is not altered by the fact that neither named plaintiff is a United States resident nor by Deloitte's contention that it may ultimately be determined that no investor of record was a United States resident. Without repeating the extensive discussion in the April 17 Opinion, suffice it to say that it remains undisputed that Deloitte applied to Berger in New York to audit the activity of a fund that it understood was managed from New York, invested in United States securi-

ties, and was open to certain classes of United States investors.

Next, Deloitte argues that Meijer–Werner's decision to invest in the Fund was driven not by his reliance on representations made in the NAV statements and audit reports, but rather by his desire to enter into a promotional arrangement with Berger. The circumstances of this promotional arrangement do not stand in the way of Meijer–Werner's representation of the class. In July 1999, two months after Prival first invested in the Fund, an agent for the Fund suggested to Meijer–Werner an arrangement by which Meijer–Werner would be paid a fee in return for bringing new investors into the Fund. Discussions about this arrangement continued for several months, but never resulted in any agreement. Meijer–Werner gave redemption orders to withdraw Prival's investment in the Fund in November and December of 1999.

Finally, Deloitte alleges that the named plaintiffs are inadequate class representatives because there are two conflicts of interest between them and the class members. These conflicts are not specific to Prival or Cromer, but would affect many investors. First, Deloitte contends that the interests of the class representatives are at odds with those of investors who may have redeemed Fund shares at artificially-inflated NAVs, at the expense of the unsuspecting shareholders remaining in the Fund, whose interests were thereby diluted. Because class members do not have "unjust enrichment" claims against each other,[16] there is no conflict to interfere with the adequacy of the named plaintiffs. Furthermore, the fact

---

**15.** Deloitte emphasizes the discussion in *Chew* about the "relatedness test," which is applied in some Circuits to determine whether the requirements of Due Process have been met. *Chew*, 143 F.3d at 29. It argues that under this test, the plaintiffs must show that Deloitte's conduct *within* the United States proximately caused the plaintiffs' injuries. The Second Circuit made clear in *Chew* that it was "at liberty" to decide for itself what the Due Process Clause required and that it would consider "all" of the defendant's contacts "with the United States." *Id.* at 30.

**16.** *See Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 599 N.Y.S.2d 816,

819 (1st Dept.1993) ("Under New York law ... a creditor, secured or unsecured, [is] entitled to demand and received payment of its debt.... That such payment deprives the obligor of funds to satisfy other creditors does not convert the creditor who is paid into a guarantor for other creditors who are not paid."). *See also Mac-Draw, Inc. v. The CIT Group Equipment Financing, Inc.*, 157 F.3d 956, 964 (2d Cir.1998); *RNB Garments Philippines, Inc. v. Lau*, No. 98 Civ. 4561(DLC), 1999 WL 223153, at *5 (S.D.N.Y. April 16, 1999); *Committee of Unsecured Creditors of Interstate Cigar Co. v. Interstate Distribution, Inc.*, 210 A.D.2d 283, 620 N.Y.S.2d 78, 80 (2d Dept.1994).

that conflicts among class members may arise at the settlement or damages stage of the litigation does not require the denial of class certification or the disqualification of these representatives. *See, e.g., Green v. Wolf Corp.*, 406 F.2d 291, 299 (2d Cir.1968); *In re Gaming Lottery Sec. Litig.*, 58 F.Supp.2d 62, 70 (S.D.N.Y.1999). If they are needed later, the court has substantial discretion to create sub-classes. *See In re Visa Check/Mastermoney*, 280 F.3d at 145; *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir.2001).

■ Deloitte also contends that a conflict of interest exists between the class representatives and those who have filed "proprietary claims" in Bermuda. Those parties attempted to purchase shares immediately before the close of the class period, but rescinded their purchases before they received any shares or their money was invested. In their Bermuda actions, these 15 would-be investors claimed priority in payment over all Fund shareholders. The proprietary claimants have reached a settlement in principle in which each of them will receive a portion of the money that was transferred to the Fund for investment purposes and an unsecured claim to be treated *in pari passu* with the claims of the investors in the Fund. This is not a disqualifying conflict.

The plaintiffs have made an adequate showing that the proposed class satisfies the prerequisites of Rule 23(a), Fed.R.Civ.P. The class is sufficiently numerous, plaintiffs have identified questions of both law and fact that are common to the class, the claims of the named plaintiffs are typical of those of the class, and the named plaintiffs and their counsel will adequately protect the interests of the class in this litigation.

### The Rule 23(b)(3) Requirements

A. *Common Questions Predominate*

Rule 23(b)(3) allows for certification of a class only where "questions of law or fact

common to the members of the class predominate over any questions affecting only individual members." Rule 23, Fed.R.Civ.P. The Rule 23(b)(3) inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy ... [and] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623, 117 S.Ct. 2231; *see also In re Visa Check/Mastermoney*, 280 F.3d at 135; *Blyden v. Mancusi*, 186 F.3d 252, 270 (2d Cir.1999). The Supreme Court has noted that the predominance requirement "is a test readily met in certain cases alleging consumer or securities fraud." *Amchem Products*, 521 U.S. at 625, 117 S.Ct. 2231.

■ With one exception, there is no dispute that each element necessary to establish liability under the causes of action here is common to the class. For example, to state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff "must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff's reliance on defendant's action caused plaintiff injury." *Rothman v. Gregor*, 220 F.3d 81, 89 (2d Cir.2000) (citation omitted). The proof for the claims of misrepresentation or omission, materiality, and Deloitte's scienter are all based on a common nucleus of facts and a common course of conduct. Deloitte argues, however, that individualized issues of reliance predominate in this action. It argues that because each investor must show its own reliance on any alleged misrepresentations, unique sets of facts overwhelm any common issues.

■ Relying on theories that have created presumptions of reliance in securities fraud cases, the plaintiffs in this action urge that the common questions will predominate over individualized ones here.[17] Specifically,

---

17. Prior to the development of the law establishing in appropriate cases a presumption of reliance, the Second Circuit had held that the Rule 23(b)(3) standard could be met with the provision of separate trials on reliance where the

defendants' alleged misrepresentations were standardized. *See Green,* 406 F.2d at 301.

Deloitte argues that bifurcation in this action would violate the Seventh Amendment because the individualized issues of fact are "inextricably

they argue that they are entitled to a rebuttable presumption of reliance on the integrity of the price reflected in the NAV statements, and confirmed by Deloitte's audits. They contend that this presumption is premised on the foundations of the "fraud-on-the-market" theory used to establish presumptive reliance on the integrity of the stock price set by an open market.

The "fraud-on-the-market" theory ("FOMT") arose as a practical response to the difficulties of proving direct reliance in the context of modern securities markets, which feature impersonal trading rather than face-to-face transactions. In this Circuit, the element of reliance is encapsulated in the concept of causation. It is well settled in the Second Circuit that

> Causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered....
>
> *Transaction causation is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment.* Loss causation is somewhat different. It has been likened to the tort concept of proximate cause, meaning that in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation.

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95–96 (2d Cir. 2001) (emphasis added and in original); *see also Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 186–87 (2d Cir.2001). Plaintiffs

are found to have alleged both transaction and loss causation where they "aver[ ] both that they would not have entered the transaction but for the misrepresentations *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction." *Suez Equity,* 250 F.3d at 98–99 (emphasis in original); *see also Grace v. Rosenstock,* 228 F.3d 40, 46 (2d Cir.2000).

Loss causation is not disputed in this action. Deloitte does not argue that the price of the Fund shares was not inflated as a result of the misrepresentations in the NAV statements. Rather, the focus of the dispute concerns transaction causation, namely, that "but for" the misrepresentations, the plaintiffs would not have invested in the Fund. The presumption operating in the FOMT applies to transaction causation. *Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.,* 967 F.2d 742, 747–48 (2d Cir.1992); *see also In re Northern Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446, 455–56 (S.D.N.Y.2000); *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 297 (S.D.N.Y.1999).[18]

Under the FOMT, an individual plaintiff need not show that he actually read or heard a misrepresentation. Rather, he is presumed to have relied on it by virtue of his reliance on a market that fully digests all available material information about a security and incorporates it into that security's price. As the Supreme Court explained in *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the seminal case on the FOMT,

> The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases,

---

intertwined" with the common issues in this action. Trying a bifurcated claim before separate juries "does not run afoul of the Seventh Amendment," however, so long as a " 'given factual issue [is not] tried by different, successive juries.' " *Robinson,* 267 F.3d at 169 n. 13 (quoting *Blyden,* 186 F.3d at 268). Seventh Amendment concerns do not require "outright avoidance" of bifurcation, but instead call for "sound case management." *Id.*

**18.** One court in this district has noted that the Second Circuit "has yet explicitly to address the issue" of how loss causation or the "proximate causation requirement is to be met in cases in which the plaintiff proceeds under a fraud on the market theory." *Fellman v. Electro Optical Sys. Corp.,* No. 98 Civ. 6403(LBS), 2000 WL 489713, at *12 (S.D.N.Y. Apr. 25, 2000).

and our understanding of Rule 10b–5's reliance requirement must encompass those differences.

"In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus, the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price."

*Id.* at 243–44, 108 S.Ct. 978 (citation omitted).

While the Court in *Basic* recognized reliance as an essential element of a securities fraud cause of action, providing the "requisite causal connection between a defendant's misrepresentation and a plaintiff's injury," it observed that there is "more than one way to demonstrate the causal connection." *Id.* at 243, 108 S.Ct. 978. In passing the Securities Exchange Act of 1934, noted the Court, Congress

expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets:

... "The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just price."

*Id.* at 246, 108 S.Ct. 978 (quoting H.R.Rep. No. 1383, at 11). The FOMT substitutes for reliance because it is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 241–42, 108 S.Ct. 978 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986)).

■ The presumption provided by the FOMT, however, is not absolute and may be rebutted where a defendant casts doubt on the causal connection at issue. For example, the presumption fails where a defendant shows that "an individual plaintiff traded or would have traded despite his knowing the statement was false," [19] or makes "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id.* at 248, 108 S.Ct. 978.

The rebuttable presumption of reliance adopted by the *Basic* Court permitted certification of a class action in a securities fraud case. It permitted the trial court to find that the common questions predominated over the particular questions pertaining to individual plaintiffs such as their individual reliance. The Court identified a number of interlocking rationales that supported adoption of a rebuttable presumption of reliance, to wit, the assistance the presumption provided in managing cases in which direct proof is difficult, fairness, judicial economy, common sense, and probability. *Id.* at 245–47, 108 S.Ct. 978.

---

**19.** Deloitte argues that the short-selling strategy employed by the Fund meant that investors chose not to rely on the Fund's price at certain times because they were gambling on a predicted fall in stock prices. While an argument of this kind might have some force if this case arose from the short selling by plaintiffs of a particular stock, where the plaintiffs were "betting" that the market price set by the publicly available information was unreliable, it has no force where the investment was in a fund and where fund investors were entitled to rely on the integrity of the net asset value of the fund, in effect its track record in the market. Even where an investor seeks a risky investment and losses are foreseeable, he is still entitled to truthful and accurate information in making investment decisions. "No purchaser of securities regardless of trading methodology or strategy would knowingly trade where material information has been misstated or withheld by an issuer." *In re Oxford Health Plans, Inc., Sec. Litig.,* 191 F.R.D. 369, 376 (S.D.N.Y.2000); *see also Michaels v. Ambassador Group,* 110 F.R.D. 84, 89 (E.D.N.Y.1986). All persons entering into financial transactions are entitled to accurate information in assessing risk. *See, e.g., U.S. v. Rossomando,* 144 F.3d 197, 201 (2d Cir.1998).

Deloitte argues that the FOMT presumption does not apply because the market for Fund shares is not of the type required by *Basic*, that is, it is not "open" or "developed." Deloitte is correct that the market for Fund shares was not an open or developed one.[20] The principles supporting the application of a rebuttable presumption in *Basic*, however, are not that the market need be "open" and "developed" *per se*, but that those features are typical of markets where share price "reflects all publicly available information, and, hence, any material misrepresentations." *Basic*, 485 U.S. at 246, 108 S.Ct. 978. This understanding of the FOMT is supported by case law preceding and subsequent to the *Basic* decision.[21]

The plaintiffs ask that a presumption akin to the presumption applied in the case of a fraud on the market be applied here. The presumption would relieve the plaintiffs of the burden of showing that each investor was provided with and specifically relied upon Deloitte's audit before each investment.[22]

In some ways this is an even stronger case for applying a presumption than those that have embraced the FOMT since it would not be based on the assumption that the representations from either Ernst & Young or Deloitte *affected* the price. Instead, the Ernst & Young calculations and NAV statements *were* the price per share, and Deloitte's audits were an explicit confirmation of the process for calculating that price. Prior to investing in the Fund, each investor received a copy of the Offer Memo, which listed Ernst & Young as the Fund administrator and Deloitte as the Fund auditor, and described the method for calculating the NAV.[23] Each of the Bermuda Defendants

**20.** While *Basic* discusses an "open" and "developed" market, it does not define those terms. A leading treatise on securities fraud, however, defines an open market as "one in which anyone, or at least a large number of persons, can buy or sell" and a developed market as "one which has a relatively high level of activity and frequency, and for which trading information (e.g. price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity." 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* ¶ 8.6(641) at 8:812 (2d ed.2000).

**21.** *See, e.g., Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir.1990) ("The fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets. An inefficient market, by definition, does not incorporate into its price all the available information about the value of a security."); *Peil*, 806 F.2d at 1161 n. 10 ("The [FOMT] theory rests on the assumption that there is a nearly perfect market in information, and that the market price of stock reacts to and reflects the available information [sic]."); *In re Executive Telecard, Ltd. Sec. Litig.*, 979 F.Supp. 1021, 1028 (S.D.N.Y.1997) ("Under the efficient market hypothesis endorsed by the plurality in *Basic v. Levinson*, the price of a security reflects all publicly available information."); *In re Towers Fin. Corp. Noteholders Litig.*, No. 93 Civ. 0810(WK)(AJP), 1995 WL 571888, at *21 (S.D.N.Y. Sept. 20, 1995) (The FOMT presumes that the market is a "transmission belt which efficiently translates all information concerning a security into a price. In other words, it presumes the operation of an efficient market."); *Cammer v. Bloom*, 711 F.Supp. 1264, 1281 & n. 26 (D.N.J.1989) ("It is not the mere status of national stock exchange listing ... that implies a market for a stock is efficient. It is, rather, that certain underlying characteristics more often than not will be associated with companies listed on national exchanges." Further, "[w]hile the location of where a stock trades might be relevant, it is not dispositive of whether the 'current price reflects all available information.' "); *Reingold v. Deloitte Haskins & Sells*, 599 F.Supp. 1241, 1264 (S.D.N.Y.1984) (The FOMT "presumes the operation of an efficient market, a market in which 'security prices reflect all public information about the economy, about financial markets, and about the specific company involved.' ... We therefore hold that the [FOMT] will only apply where the market concerned is an efficient one.") (citation omitted); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 144 (N.D.Tex.1980) ("[T]he central assumption of the fraud on the market theory [is] that the market price reflects all representations concerning the stock.").

**22.** Ernst & Young provided each investor with an NAV calculation with the confirmation of its investment. There was apparently no procedure for providing each investor with the Deloitte audit prior to each investment.

**23.** The Offer Memo states that "[t]he Net Asset Value per Share is equal to the relevant Net Asset Value divide [sic] by the number of Shares outstanding. The resultant Net Asset Value per Share is then expressed in U.S. dollars adjusted to two decimal places." According to the Offer Memo, the initial offering price for shares of the Fund was $100 per share. Investors bought and sold shares at the NAV which, pursuant to the Offer Memo, was "binding on all parties."

was an identified speaker: Ernst & Young through its NAV statements and Deloitte through its audits. *See Wright v. Ernst & Young, LLP,* 152 F.3d 169, 175 (2d Cir.1998). From the time that Ernst & Young calculated and disseminated its first NAV, and Deloitte issued its first "clean" audit, investors were entitled to presume that the NAVs had in fact been calculated as described in the Offer Memo, and that Deloitte had in fact performed an audit in accordance with applicable professional standards, and had confirmed the year-end NAV, and through that confirmation, the administrator's process for calculating the NAV.

Deloitte contends that plaintiffs' inability to prove that each investor received an audit report prior to investment is fatal to the application of a presumption of reliance in this case. This assertion, however, overlooks the goal behind the requirement of a showing of transaction causation in order for securities fraud liability to attach. Transaction causation requires a showing that "but for" the overstated NAVs calculated by Ernst & Young and confirmed in Deloitte's audits, the investors would not have invested in the Fund. The plaintiffs represent that they will prove at trial that an accurate audit would have had an immediate impact on Ernst & Young's calculation of the NAV, and of course, it is not disputed that the fraudulent scheme alleged here depended upon a regular recalculation of the NAV at an inflated value. As described by the plaintiffs, the engine of this fraud would have come to a screeching halt as soon as either Ernst & Young distributed an uninflated NAV or Deloitte issued an accurate audit. While it is not the task of this Court to evaluate the merits of the claims in the context of this motion, there can be no credible argument that any one of these investors would have invested in the Fund if the investor had understood that Berger was "cooking the books," although the defendants remain free to offer evidence and argument to that effect at trial. In this regard, it is worth observing again that it is undisputed by all parties that

each of the plaintiffs was a sophisticated investor.

In sum, as was true in *Basic,* it is "hard to imagine" that any investor in the Fund did not rely on the integrity of the NAV calculations. *Id.* at 247, 108 S.Ct. 978 (citation omitted). "Who would roll the dice in a crooked crap game?" *Id.* (citation omitted). The line of argument submitted by the plaintiffs is sufficient to permit a presumption of reliance. Courts presume reliance "where it is logical to presume that reliance in fact existed." *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 375 (2d Cir.1973). It is difficult to imagine an investor putting money into any fund without relying on the integrity of the process for calculating the fund's NAV, as supported by auditor review. Just as the FOMT presumes that investors rely on the integrity of a process—namely, that the market will incorporate material information about a security into its price—the theory advanced by the plaintiffs in this case also presumes that investors rely on the integrity of a process— namely, the processes by which the NAV of a private fund is determined and then confirmed by that fund's auditor. As in *Basic,* fairness, judicial economy, common sense and probability all support adoption of a rebuttable presumption that investors in the Fund relied in their investment decisions on the integrity of the NAVs calculated, issued and confirmed by the Bermuda Defendants.[24]

Deloitte argues that it cannot be liable for securities fraud based on allegations that its audits confirmed a false or misleading NAV statement attributed to someone else, be it Berger or Ernst & Young. Under *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 167, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), private civil liability under Section 10(b) applies only to those who "engage in the manipulative or deceptive practice" and not to those "who aid and abet the violation." The complaint does not purport to hold Deloitte liable as an abettor of another's violation, but as a principal. Deloitte may be

---

24. Underscoring this logical connection, the plaintiffs point to notes from an Ernst & Young workpaper from May and June of 1999, which noted that "clean audit opinion and no management letter points confirms NAV work during 1998 and 1997."

liable as a primary violator of the securities laws to any investor who purchased Fund securities after issuance of a Deloitte audit. In its audits, Deloitte spoke, describing the fruits of its own investigation. Even though the audits did not provide a current NAV calculation, they did confirm the accuracy of the annual Ernst & Young NAV calculations and thereby the reliability of the method by which Ernst & Young calculated each NAV figure. To ignore the significance of this independent confirmation to investors is to blink reality.[25]

Deloitte makes many additional arguments against the application in this case of a presumption of reliance, including most prominently, that the investors relied on third parties, such as investment advisors; that some investors may have had access to information provided directly by insiders such as Berger; that the named plaintiffs' reliance on the NAV and audits was unreasonable in light of rumors circulating about the Fund and specific warnings given to them; and that there is evidence that the named plaintiffs and other investors did not read or rely on the audits. Despite these arguments, it remains appropriate to apply a presumption of reliance in this case.

Reliance on third parties, such as investment managers, does not undermine the reliability of the presumption where the advice itself is based upon or assumes the accuracy of the NAV. Deloitte has pointed to no

evidence that third party advice was based on anything other than this type of information, and as a logical matter no honest advisor would have recommended an investment in the Fund based on an understanding that the NAV was a manufactured, fictitious number.

■■ Deloitte argues that some investors, including at least one of the named plaintiffs, may have had access to information provided directly by insiders, such as Berger.[26] A defendant who is otherwise liable for securities fraud is not rendered immune because the victim relied on misrepresentations from several sources. Deloitte does not suggest, and has not offered any evidence, that an insider disclosed the existence of the fraud to any investor.

■■ Deloitte does point to rumors that began to circulate about the Fund in 1999, as well as to specific warnings given to the named plaintiffs.[27] Deloitte argues that these rumors made it unreasonable for the named plaintiffs to continue to rely on the integrity of the Fund's NAV. An investor may not justifiably rely on a misrepresentation if, through "minimal diligence," the investor should have discovered the truth. *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir.1993). In this case, the admitted sophistication of the investors weighs in favor of a heightened burden of

---

**25.** Deloitte also argues that the class should not be certified on the common law claims because the presumption of reliance does not extend to those claims. While the New York Court of Appeals does not appear to have decided whether the "fraud on the market" theory can be used to satisfy the reliance requirement of state common law claims, *see, e.g., In re Sumitomo Copper Litig.*, 262 F.3d at 142, courts in this district have held that in certifying a plaintiff class for state claims, "pendent state law claims also are properly certified for class treatment when they arise out of the same acts of the defendants, and when proof at trial will be the same for both claims." *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 172 (S.D.N.Y.1997); *see also Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 58 (S.D.N.Y.1993). Those conditions are met in this action. If the Court later determines that certification of the state law claims has made the action unmanageable, it can "revisit the issue." *Id.*

**26.** Deloitte points to two meetings and a series of telephone conversations that Meijer–Werner had with Berger.

**27.** For example, after Prival had completed its investments in the Fund, two individuals expressed concerns to Meijer–Werner of Prival about the results being posted by the Fund. Meijer–Werner testified in his deposition that he considered these warnings, which he characterized as vague and just someone's "feelings," an inadequate basis to withdraw from the Fund given that the Fund was audited by Deloitte and administered by Ernst & Young. Also, after Cromer had made three of its five investments in the Fund, Cromer's investment advisor recommended that Cromer sell a portion of its interest in the Fund. Hackl has testified on behalf of Cromer that he decided at the time that "it was better to stay with that investment ... because the performance [of the Fund] overall was good."

diligence.[28] While a jury will determine whether any failure by Hackl or Meijer–Werner to engage in further inquiry was reckless or unjustified, nothing presented by Deloitte suffices to undermine the soundness of a presumption of reliance in this case. The rumors to which Deloitte points circulated in the last months of the Fund. The fraud remained essentially concealed until the end, eluding discovery even by the Fund's auditor apparently.

Finally, Deloitte contends that it will be able to show that Cromer did not rely on the Deloitte audit since the audit indicated that the Fund had violated the sector concentration limits described in the Offer Memo,[29] and Cromer's representative testified that those limits were important to Cromer's investment decisions. If Deloitte is able to show that either Cromer or Prival would have chosen to invest in the Fund despite knowing that the NAV was significantly inflated, or if it is able in any other way to sever the link between the misrepresentations alleged here and the decisions by the class representatives to invest in the Fund, that evidence would rebut the application of the presumption; it would not, however, undermine the validity of applying the presumption in the first instance.

In sum, the plaintiffs have shown that it is appropriate to apply a presumption of reliance on Deloitte's audits. While Deloitte has identified evidence and arguments it may use at trial to rebut the presumption, it remains true that it is logical and fair to presume reliance here. As a consequence, the common questions will predominate at trial over the individualized ones identified by Deloitte.

**28.** In *Brown,* the Second Circuit listed factors relevant to the determination of whether an investor acted recklessly and without justifiable reliance:

(1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

## B. *Superiority of Class Action*

Rule 23(b)(3) also requires plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Factors relevant to the superiority of a class action include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

*Id.* These factors are "nonexhaustive." *Amchem Products,* 521 U.S. at 615, 117 S.Ct. 2231.

A class action is the superior method for the fair and efficient adjudication of this controversy. The potential class members are both significant in number and geographically dispersed. The interest of the class as a whole in litigating the many common questions substantially outweighs any interest by individual members in bringing and prosecuting separate actions. To force each investor to litigate separately would risk disparate results among those seeking redress, would encourage a race to judgment given the limited funds available to fund recovery here,[30] would exponentially increase the costs of litigation for all, and would be a particularly inefficient use of judicial resources.

*Id.*

**29.** The plaintiffs contend that the audits do not unambiguously disclose the concentration of the Fund assets.

**30.** The Bermuda Defendants have represented that their insurance coverage is insufficient to cover all of the losses sustained by Fund investors. Berger and Financial Asset Management, Inc., the other defendants here, cannot be expected to contribute materially, if at all, to recovery.

The factors listed in Rule 23(b)(3) as particularly relevant to the issue of superiority reinforce the conclusion that a class action would be appropriate here. Relatively few of the investors have indicated a desire to litigate their claims outside the context of a class action, even though they are all concededly "sophisticated" investors. The concentration of this litigation in the Southern District of New York will mean the continued coordination of all litigation concerning the Fund, with extraordinary savings in costs and energy for not just the plaintiffs, but also for Deloitte.[31] Finally, there are no apparent difficulties that are likely to be encountered in the management of this action as a class action apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel.

■ Deloitte relies principally on two arguments in an effort to show that the class action device is not superior here. First, it argues that the wealth and sophistication of the putative class members, as well as the average size of their claims, weigh against class treatment and in favor of separate litigation. It is not disputed that the majority of investors in the Fund are sophisticated institutional investors who made substantial investments in the Fund. While the creation of the Rule 23(b)(3) class action device was largely motivated by the desire to vindicate " 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all,' " *Amchem Products,* 521 U.S. at 617, 117 S.Ct. 2231 (quoting Kaplan, A Prefatory Note, 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969)), neither the language of the Rule nor its application over the decades has counseled that it is exclusively for their benefit. Instead, the ability of class members to bring individual actions is merely a factor that must be weighed in deciding whether to certify the class. Among other things, courts

must ensure that the class action device is not exploited by large claimants simply to strengthen their bargaining position. That is not the case here. This is not a "strike" suit filed by "professional plaintiffs." *AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202, 218 (2d Cir.2000).

Deloitte does not dispute that the financial statements prepared by Berger were fictitious or that the losses were real and substantial, or even that its own audits contained false information. The crux of the issues in this lawsuit will be what Deloitte knew, when it knew it, and what it did about it. It has explicitly stated that it intends, as is its right, to defend every suit brought by any Fund investor vigorously, and by its conduct of this litigation to date it is working to fulfill that promise. Given the high cost of this litigation, it is not clear that all of the investors would pursue or would even be able to pursue litigation without the class action option. But, even if each class member did have claims substantial enough to merit the expense of private actions, and the ability to prosecute those claims vigorously, the class action device would remain the superior mechanism for resolving the issues between all class members and Deloitte efficiently and fairly.

■ Deloitte also argues that the class-wide resolution of this action is not a superior means of adjudicating the controversy because a decision in this court favorable to it might not be given preclusive effect in foreign courts. The *res judicata* effect of a class action judgment is a factor that must be considered in evaluating the superiority of the class action device. *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 996 (2d Cir. 1975); *Ansari v. New York University,* 179 F.R.D. 112, 116 (S.D.N.Y.1998). A prevailing defendant is "entitled to a victory no less broad than a defeat would have been." *Bersch,* 519 F.2d at 996. There is a distinction, however, between those circumstances

---

31. In connection with the factors relevant to the superiority of a class action under Rule 23(b)(3), Fed.R.Civ.P., Deloitte argues again that Bermuda would be a more convenient forum for it than New York. This Court has declined to dismiss this action on the ground of *forum non conveniens. Cromer Finance Ltd. v. Berger,* 158 F.Supp.2d 347 (S.D.N.Y.2001). The recent *en banc* decision in *Iragorri v. United Technologies Corp.,* 274 F.3d 65 (2d Cir.2001), confirmed the existence of a rebuttable presumption in favor of a plaintiff's choice of forum even when the plaintiff is foreign.

in which there is a "possibility" that a foreign court may not recognize a judgment, and those in which there is "near certainty" that it will not be recognized. *Id.* In *Bersch,* in the face of uncontroverted affidavits that five foreign jurisdictions would not recognize a United States class action judgment favoring a defendant, even when their citizens had received notice that they would be bound unless they opted out, the Second Circuit concluded in 1975 that this factor, among others, required the elimination of "all purchasers other than persons who were residents or citizens of the United States" from a class action brought on pendent state law claims. *Id.* at 996–97. *See also Del Fierro v. Pepsico Int'l.,* 897 F.Supp. 59, 64 (E.D.N.Y.1995) (dismissing suit over "instant-cash" promotional game in Philippines where Philippines substantive law would apply and American judgment would be vulnerable to claim, *inter alia,* that it was based on mistake of law).

 Even where all the available evidence indicates that foreign plaintiffs who lose in the United States will be able to sue the defendant a second time in their own country, a class action may remain the superior means for litigating the dispute, particularly where the court can take action to increase the benefits for the defendant as well as the plaintiffs. For instance, in *In re Lloyd's American Trust Fund Litigation,* No. 96 Civ. 1262(RWS), 1998 WL 50211 (S.D.N.Y. Feb. 6, 1998), the Honorable Robert W. Sweet was presented with uncontroverted evidence that foreign plaintiffs would be able to bring a second lawsuit in five foreign countries if the class action resulted in a verdict for the defendants. Judge Sweet nonetheless found the class action device superior in a suit by beneficiaries of trust funds held by Citibank in connection with insurance underwriting performed by the plaintiff class through Lloyd's of London. He found that

foreign courts, even if faced with a second round of litigation, may look to the results achieved in the United States for guidance, and that if the plaintiffs succeed or if the action were settled, a court-fashioned proof of claim mechanism might be able to bind all participants and discourage relitigation. *Id.* at *15.

Here, the experts on British and Swiss law for both the plaintiffs and Ernst & Young concede that there is no authoritative law in either jurisdiction indicating whether a class action judgment favorable to a defendant would be given preclusive effect in those countries. The Ernst & Young expert on British law notes, however, that foreign judgments are only recognized as binding by the English courts where the plaintiff "voluntarily submitted to" the foreign court's jurisdiction, a requirement which he sees as lacking in a Rule 23(b)(3) action. In contrast, the plaintiffs' expert is of the opinion that English courts will "more likely than not" consider those individuals who receive notice of the class action and who do not opt out to be bound by the foreign court's judgment. The Ernst & Young expert on Swiss law states that binding class members who are not individually identified and named would be in violation of the "Swiss ordre public," because it would in essence bind individuals "against their intention." The plaintiffs' Swiss law expert disagrees, noting that Swiss public policy is "applied in an attenuated fashion" where the enforcement of foreign judgments is involved. He concludes that there is a "strong likelihood" that Swiss courts could enforce a United States class action judgment, so long as class members have been duly notified of their right to opt out and due process has been respected throughout the United States proceedings. As such, it is at most a "possibility" that a defense verdict will have no *res judicata* effect abroad.[32]

---

**32.** As the plaintiffs point out, many events would have to occur before Deloitte would be prejudiced by an inability to assert the defense of res judicata successfully. Specifically, (1) the class action would have to be tried to judgment, despite the greater likelihood that the case would instead be settled; (2) the class would have to lose on the merits; (3) an absent class member would have to bring a subsequent lawsuit in an

English or Swiss court, despite such practical deterrents as the unavailability of contingent-fee representation or a class action vehicle in those courts; (4) the absent class member would have to succeed in establishing jurisdiction over the defendants in that foreign court; (5) the absent class member would have to convince the foreign court to ignore this Court's ruling and render judgment in its favor on the merits; and (6) the

In sum, the plaintiffs have shown that the benefits of class certification are significant and that this device is superior to other available methods for the fair and efficient adjudication of this controversy. Because Deloitte has not presented arguments sufficient to outweigh these demonstrated benefits, the motion to certify a class of investors is granted.

## CONCLUSION

The plaintiffs' motion to certify a class to try the claims against defendants Michael Berger, Financial Asset Management, Inc., and Deloitte & Touche (Bermuda) is granted.

absent class member would have to then convince a Bermuda court to enforce the foreign judgment and ignore the judgment rendered by this Court.