James E. FOX; John H. Makowsky; and Nicholas J. Crismale, Individually and On Behalf of: All Others Similarly Situated, Plaintiffs,

v.

CHEMINOVA, INC.; Cheminova Agro A/S; Agrevo Environmental Health, Inc.; Clarke Mosquito Control Products, Inc.; Zoecon Corporation; and Corporations "1" through "5", Defendants.

No. CV–00–5145(TCP)(ETB).

United States District Court, E.D. New York.

Feb. 28, 2003.

Gladstone N. Jones, III, Spiro J. Verras, Peter N. Freiberg, Kevin E. Huddell, Anthony D. Irpino, Smith, Jones & Fawer, L.L.P., New Orleans, LA, Jerry Lee Snead, Van-Brunt Juzwiak & Russo, P.C., Sayville, NY, for plaintiffs.

Christopher G. Kelly, Haight Gardner Holland & Knight, New York City, William M. Savino, Rivkin, Radler & Kremer, Uniondale, NY, William A. Krohley, Kelley, Drye & Warren, LLP, New York City, Alan R. Dolinko, Chuhak & Tescon, P.C., Chicago, IL, for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court is a motion by plaintiffs James E. Fox ("Fox"), John H. Makowsky ("Makowsky"), and Nicholas J. Crismale ("Crismale"), on behalf of themselves and all others similarly situated, for class certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

For the reasons stated below, the instant motion for class certification is hereby GRANTED.

### BACKGROUND

This lawsuit was brought by Fox, Makowsky and Crismale (collectively "Plaintiffs") on behalf of themselves and all other licensed commercial fishermen from New York and Connecticut who are in the business of trapping and selling lobsters in Long Island Sound and who were damaged as a result of the dying off of their resources beginning in September 1999.

Defendants Cheminova, Inc., Cheminova Argo A/S, Agrevo Environmental Heath, Inc., and Clarke Mosquito Control Products, Inc. (collectively "Defendants")[1] are producers and manufactures of various pesticides and insecticides used, *inter alia*, for the control of mosquito populations that spread the West Nile Virus.[2]

In the instant motion, Plaintiffs seek to certify the following claimants in this matter:

All persons or other legal entities that possess or possessed a valid commercial fishing license or licenses issued by the State of New York and/or the State of Connecticut which permitted them to catch and take lobsters (*homarus americanus*) from the waters of the Long Island Sound within the territories of the State of Connecticut and/or the State of New York for commercial purposes or for purposes of sale, and who, beginning in September 1999, suffered or sustained legally cognizable damages or suffered a legally cognizable harm as a result of the application of insecticides (adulticides or larvicides) man-

ufactured by the defendants to this lawsuit in the State of New York and the State of Connecticut that began in September 1999. (Pls.' Mem. in Supp. of Mot. for Class Certification (hereinafter "Pls.' Mem.") at 1.) Defendants oppose the instant motion.

### A. Factual Background[3]

Plaintiffs brought this action in August 2000 against various manufacturers of pesticides and insecticides sprayed in and around the New York metropolitan area beginning in September 1999. It is uncontroverted that these pesticides and insecticides were sprayed in order to combat the perceived threat of an outbreak of the West Nile Virus first appearing in Queens County in or about August and September 1999.

Plaintiffs, licensed lobster fisherman, allege that the pesticides sprayed in September and October 1999 caused or contributed to an ensuing massive die-off of the lobster population in Long Island Sound. Plaintiffs further allege that the damaging effects of the pesticides on the lobster population were exacerbated by the passing of Tropical Storm Floyd from September 15–17, 1999, which dumped large amounts of rain in the New York area and caused a significant runoff of effluent and storm water to enter Long Island Sound. The large number of lobster mortalities resulted in Plaintiffs allegedly suffering a significant loss of revenue from harvesting and selling lobsters.

#### 1. Spraying of Pesticides

During late-August, early-September 1999, an encephalitis-type illness was discovered in several individuals, mostly elderly people, in Queens County, New York. In order to pre-

---

**1.** Defendant Zoecon Corporation did not join in Defendants' Opposition to Plaintiffs' Motion for Class Certification. Defendants note that Zoecon has yet to appear in this action, which has been ongoing for well over two years. (Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification (hereinafter "Defs.' Opp'n") at 3.)

**2.** Defendant Cheminova Agro A/S manufactures a pesticide/insecticide containing the active ingredient malthion and markets and sells this pesticide/insecticide under the trade name Fyfanon® ULV. Defendant Cheminova, Inc. is the United States distributor of Fyfanon® ULV for Cheminova Agro A/S. Defendant Agrevo Environ-

mental Health Inc., now known as Aventis Environmental Science, USA, LP, is the manufacturer of a pesticide/insecticide containing the active ingredient resmethrin and sold under the trade name Scourge®. Defendant Clarke Mosquito Control Products manufactures a pesticide/insecticide containing the active ingredient sumithrin, sold under the trade name Anvil® 10+10 ULV.

**3.** The parties submitted voluminous exhibits with their respective motion papers. Herein, this Court attempts to summarize the most important aspects of the factual material accompanying the instant motion.

vent the continued spread of what was feared to be the West Nile Virus, various pesticides were sprayed in and around the New York metropolitan area.[4]

The spraying involved various adulticides—products used to kill adult, airborne mosquitos—and larvicides—products used to kill mosquitos in their larva stage. Plaintiffs have submitted voluminous data regarding the application of pesticides in September and October 1999 in the areas of Nassau and Suffolk Counties on Long Island, all five Boroughs of New York City, Westchester County, and Connecticut. These data state the types and amounts of products, the method of application—aerial, ground or via storm drains—and dates of application. (Pls.' Mem. at 12–15.)[5]

Defendants contend that the data submitted by Plaintiffs fail to show that pesticides were applied to any surface waters in Long Island Sound. Further, Defendants claim that the products at issue in this lawsuit

4. Plaintiffs contend that City officials decided to spray the entire city of New York twice with pesticides, even though there was some doubt that the situation presented a true emergency. Plaintiffs submit that this plan was developed by Gerald McCarty ("McCarty"), then a member of the Mayor's Office of Emergency Management, even though McCarty and his staff had no experience responding to mosquito-born infectious diseases or the application of pesticides.

However, Defendants paint a different picture of events. They claim that on September 3, 1999, trained experts made an informed decision to administer pesticides, given the state of emergency present in Queens. Defendants assert that the superintendent for the Division of Vector Control in Suffolk County Department of Public Works, his counterpart in Nassau County, and representatives from the New York City Department of Health, New York City Mayor's Office of Emergency Management, New York State Department of Environmental Conservation, the Federal Centers for Disease Control and Prevention in Atlanta, and Mayor Giuliani all met on September 3, 1999. The officials involved allegedly made a unanimous decision to begin the application of pesticides.

In their filings, the parties discuss at great length how and why officials made the decision to spray pesticides in the greater New York area. For the purposes of determining the appropriateness of class certification, however, the presence or absence of negligence on the part of local officials is not the concern of this Court. The sole issue currently facing this Court is whether Plaintiffs satisfy the requirements for class certification pursuant to the Federal Rules of Civil Procedure, discussed further *infra*.

5. At the time the instant motion was filed, liability discovery had not yet taken place in this action. Plaintiffs offer these statistics to generally establish the quantity of pesticides applied in the Fall of 1999, the geographic areas where the pesticides were applied, and the timing of these applications at they coincided with Tropical Storm Floyd. Below is a summary of the data offered by Plaintiffs.

In New York City: 4561 gallons Fyfanon by aerial application (on 9/3, 9/4, 9/6, 9/7, 9/8, 9/9, 9/10, 9/11, 9/12, 9/13, 9/14, 9/18, 9/19, 9/20, 9/22, 9/23); 160 gallons of Anvil by aerial application (on 9/11, 9/12, 9/13, 9/19, 9/20), 2000 gallons of Scourge and 568 gallons of Anvil by ground application (on 9/3, 9/11, 9/12, 9/13, 9/18, 9/19, 9/20, 9/22, 9/23, 9/29, 10/1, 10/2, 10/3), and 135,-000 Altosid Briquets via storm drains. (Pls.' Mem. at 12–13.) Plaintiffs offer spray maps to illustrate that pesticides were applied from helicopters directly along the shoreline and over the islands situated in Long Island Sound, including City Island, Hart Island, Hunter Island, Twin Island, Rikers Island and Wards Island. (Pls.' Mem. at 13, Ex. 12.) Further, Plaintiffs note that the first pesticide application in New York City ended on September 14, 1999, and the second application over the city began on September 18, 1999. (Pls.' Mem. at 13.) The event that lies between the two applications is Tropical Storm Floyd, which occurred from September 15–17, 1999, and which Plaintiffs contend washed extensive amounts of storm water into Long Island Sound.

In Nassau County: 652.3 gallons of Anvil by aerial application (on 10/8, 10/9, 10/11), 167 gallons of Scourge by truck application (on 9/26, 9/28, 10/11, 10/12, 10/13, 10/15), and 5794 Altosid Briquets via storm water recharge basins. (Pls.' Mem. at 13) Plaintiffs contend that a total of 134,572 acres of land in Nassau County were sprayed with Anvil released from helicopters flying almost the entire width of Long Island. In addition, trucks applied pesticides along the shoreline of Long Island Sound in Nassau County. (Pls.' Mem. at 13–14, Ex. 14.)

In Suffolk County: 180 gallons of Fyfanon by aerial application (on 9/28 in northern portion of the county), and 3549 ounces of Anvil and 8831 ounces of Scourge by truck (on 9/24, 9/27, 9/28, 9/29, 10/1, 10/2, 10/3). (Pls.' Mem. at 14.)

In Westchester County: 1620 gallons of Anvil by aerial application (on 9/23, 9/24, 9/26, 9/27, 10/8, 10/9 in southern portion of the county and on 10/11, 10/12, 10/13, 10/15, 10/16, 10/17 in northern portion of the county). (Pls.' Mem. at 14.)

In Connecticut: 118.5 gallons of Scourge by truck application (on 9/23, 9/24, 9/27, 9/28, 10/1), 2.5 gallons of Anvil by truck application on Sherwood Island (9/28), and 1063 Altosid Briquets applied by hand in catch basin in Fairfield County. (Pls.' Mem. at 14–15.)

represent only a small percentage—0.08%—of all federally-registered, restricted-use pesticides applied in the New York area in 1999. (Defs.' Opp'n at 3.) Finally, Defendants highlight that the data offered by Plaintiffs show New York City as the only geographic area in which pesticides were applied prior to September 15, 1999, the date when Tropical Storm Floyd hit the New York area. Defendants assert, therefore, Plaintiffs' theory that the high winds and rains resulting from Tropical Storm Floyd contributed to pesticide runoff into Long Island Sound is erroneous.

## 2. Lobster Mortalities

Although the issue of causation is disputed in this action, both Plaintiffs and Defendants agree that a die-off of the Long Island Sound lobster population occurred in the fall of 1999. Plaintiffs claim that Long Island lobstermen began to observe multitudes of dead and dying lobsters in mid-September 1999. Defendants assert that the lobster die-off began in July and August 1999, or even earlier, well before the application of pesticides to combat the West Nile Virus and well before Tropical Storm Floyd.

The different areas of Long Island Sound experienced varied reduction in the lobster population.[6] The New York State Department of Environmental Conservation ("NYDEC") prepared an analysis of the projected loss to the New York portion of the Long Island Sound fishery (hereinafter "NYDEC study"). The NYDEC study showed a decrease in lobster catches during weeks 40 through 47 in 1999 in all six (6) areas of Long Island Sound, with the greatest devastation in Western Long Island Sound, the area closest to New York City. (Pls.' Mem. at 16, Ex. 18.) Using four (4) different scenarios, the NYDEC study calculated the loss of revenue in wholesale landings to New York lobstermen in 1999 as ranging from $9,250,000 to $19,600,000.[7] (Pls.' Mem. at 16, Ex. 18.)

In Connecticut, catch records compiled by the CTDEP confirm a significant drop-off in the pounds of lobsters landed in Connecticut ports in Fall 1999. For instance, Fall 1999 landings for all ports from Norwalk to Greenwich declined between 91 percent and 99 percent from the 1995–1998 averages. (Pls. Mem. at 17, Ex. 20.) The total amount of pounds of lobster landed from Connecticut waters by commercially licensed lobstermen decreased from 5,602,406 pounds in 1998 to 3,679,744 pounds in 1999 to 1,660,932 pounds in 2000. (Pls. Mem. at 17, Ex. 20.)

Defendants argue that the lobster mortalities began well before any spraying of pesticides in September 1999. Further, Defendants contend that different areas of Long Island Sound experienced varying severity of lobster die-off, and the lobster mortalities occurred in these areas for different reasons. For instance, Defendants assert that the lobster mortality problem experienced by lobstermen in Eastern Long Island Sound was due to a shell disease problem that had been ongoing for years. In support of their argument, Defendants provided findings from various studies, most notably a report compiled by Michael Loughlin for the Connecticut Commercial Lobsterman's Association (hereinafter "Loughlin Report"). The Loughlin Report indicated that there were

6. The Connecticut Department of Environmental Protection ("CTDEP") has divided Long Island Sound into six (6) areas in order to maintain statistics on fishing efforts and lobster catches. The divisions provided by CTDEP include: Areas 1 (northeastern); Area 2 (north central); Area 3 (northwestern); Area 4 (southwestern); Area 5 (south central); and Area 6 (southeastern). (Pls.' Mem. at 3, Ex. 4.) Furthermore, Long Island Sound is informally divided into three separate areas: Western Long Island Sound (from Bridgeport, Connecticut west to New York City); Central Long Island Sound (Bridgeport, Connecticut east to Old Saybrook, Connecticut); and Eastern Long Island Sound (everything east of Old Saybrook, Connecticut).

The bottom of Long Island Sound is not uniform and can be muddy, sandy, and/or rocky. In Western Long Island Sound, the bottom is muddy and becomes increasingly sandy and rocky moving eastward. Although there are differences in the way lobstermen fish depending on the type of bottom, all Long Island lobstermen use the same general technique and equipment to catch lobsters, and lobsters can be caught throughout the entirety of Long Island Sound.

7. It is important to note that these figures encompass lobster losses for the entire year of 1999, whereas this action concerns only those losses occurring after the spraying of pesticides in mid-September 1999.

high levels of chemicals, such as chlorine, copper, and nitrogen compounds, present in the Connecticut watershed. These chemicals, which could have been a result of discharge from sewage treatment plants or chlorine bleach runoff, likely caused or contributed to " 'hazardous environmental conditions for lobsters and other marine life.' " (Defs.' Opp'n at 27, Ex. T at 1.) Thus, Defendants argue that the cause of the massive lobster die-off is complex and uncertain, and the levels of lobster mortalities were inconsistent throughout Long Island Sound.

### 3. Named Plaintiffs

The named plaintiffs have been involved in commercial lobstering for many years: Makowsky since 1974; Crismale since 1979; and Fox since 1990. Plaintiffs contend that practices of the three (3) named Plaintiffs are typical of lobster fishermen in Long Island Sound in at least the following respects: they all trapped the same species of lobster (*homarus americanus*); they all trapped lobsters in the waters of Long Island Sound; they were all licensed to trap lobsters on a commercial basis by Connecticut and/or New York States in 1999; they all lived in either New York or Connecticut; they all sold the lobsters they trapped to wholesalers or commercial distributors; they all shared a common connection to the waters of Long Island Sound; they were all satisfied with their occupations as commercial fisherman; they all owned and used generally the same type of fishing gear; they all owned the vessels from which they fished; they all generally used the same method for trapping lobsters;[8] they all generally trapped lobsters at certain specified times of year; they all abided by the same restrictions as to what size of mature lobsters they harvested; and they were or are members of various associations of the Long Island Sound Lobstermen, an organization that holds regular meetings to discuss the industry.

Furthermore, Plaintiffs contend that the three (3) named plaintiffs broadly represent the geographic spectrum of Long Island Sound (from east to west and north to south), the method of fishing (from directional placement of their traps, length of soaking, and productivity), and the extent to which they have been harmed by the mass lobster mortality that began in September 1999 (from being forced out of the industry to losing only part of their income.)

Plaintiffs assert that, although the exact number of commercial lobstermen working in the waters of Long Island Sound in 1999 is not certain, there were over three hundred (300) persons who held licenses issued by the States of New York and/or Connecticut in 1999 and who depended on, in whole or in part, revenue gained from trapping and selling lobsters for their livelihood.

Defendants argue that certification is not proper in the case at bar given that Plaintiffs' claims are based upon the application of different products, at different times, under different conditions, to different areas of Long Island Sound. Further, Defendants maintain that Plaintiffs all employ different fishing methods, fish in drastically different ecosystems across Long Island Sound, and suffered differing harms from differing sources. Defendants argue that there are many possible causes of the lobster mortalities, and the exact causes of the 1999 die-off are currently under investigation. Finally, Defendants contend that Tropical Storm Floyd could not have contributed to the runoff of products into Long Island Sound, given that the only pesticide applications prior to that time were limited to New York City.

### B. Procedural Background

On August 25, 2000, Plaintiffs filed a Complaint asserting that as a result of the application of pesticides and insecticides manufactured by Defendants to the greater New York area, those geographic areas became heavily polluted causing the illness and death of many lobsters in Long Island Sound. On March 1, 2002, Plaintiffs moved this Court for an order granting class certification to Plaintiffs and all others similarly situated. Defendants opposed that motion. On March

---

8. Long Island Sound lobstermen place traps on the bottom with bait inside and allow these traps to "soak" or sit for several days before hauling the traps onto their vessels to remove the lobsters and re-bait the traps.

8, 2002, the parties appeared before this Court to argue Plaintiffs' motion for class certification. After hearing oral argument, this Court reserved decision.

On September 30, 2002, this Court issued an Order denying Plaintiffs' motion for class certification, without prejudice to renew. This Court found prevailing jurisdictional questions existed that the parties failed to adequately address in their respective motion papers. Namely, a question remained whether Plaintiffs could adequately prove that enough members of the proposed class suffered damages above the requisite amount-in-controversy threshold for diversity jurisdiction. This Court ordered Plaintiffs to:

> produce proof of a sufficient number of class members who suffered damages in excess of $75,000 during the operable period, thereby enabling this Court to reasonably conclude that Plaintiffs will have no difficulty satisfying the numerosity requirement of Rule 23(a). The parties should appear before this Court in a hearing to determine the best processes and the appropriate amount of time needed to prove these damages.

(Memorandum and Order of 9/30/02.)

The parties appeared before this Court on November 1, 2002. At that status conference, various options were discussed regarding how to provide this Court with the needed information. It was decided that Plaintiffs would submit to the Court an expert's affidavit addressing the issue of damages. On November 14, 2002, Plaintiffs filed the Affidavit of Christopher L. Dyer ("Dyer"), a natural resource management expert, in support of Plaintiffs' motion for class certification. On December 20, Defendants filed the Declaration of R. Bruce Tillman ("Tillman"), an authority in maritime catastrophes, as well as a Response in Opposition to the Affidavit of Christopher Dyer. Plaintiffs subsequently filed a Memorandum in Reply to Defendants' Opposition on December 26, 2002. The substance of these filings will be discussed further *infra.*

## DISCUSSION

### A. Standard of Review

■ The Supreme Court held that before certifying a class, district courts must conduct a "rigorous analysis" to determine whether the requirements of Fed.R.Civ.P. 23 have been met. *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir. 1999) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Although district courts have broad discretion to certify a class, class certification standards should be applied liberally. *E.g., Gary Plastic Packaging Corp. v. Merrill Lynch,* 903 F.2d 176, 179 (2d Cir.1990); *Pecere v. Empire Blue Cross & Blue Shield,* 194 F.R.D. 66, 69 (E.D.N.Y. 2000) (Glasser, J.) ("[T]he law in the Second Circuit favors a liberal construction of Rule 23 . . .").

■ When deciding a motion for class certification, courts must treat as true all allegations contained in the complaint. *Pecere,* 194 F.R.D. at 69 (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)); *In re Indus. Diamonds Antitrust Litig.,* 167 F.R.D. 374, 378 (S.D.N.Y.1996) (citations omitted). Therefore, a motion for class certification is not the appropriate forum for discussing the merits of the case at bar. " '[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" *In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 133 (2d Cir.2001) (quoting *Eisen,* 417 U.S. at 178, 94 S.Ct. 2140). It does not follow, however, that courts are restricted to the pleadings when making class certification decisions. Courts may go beyond the pleadings in order to determine whether the plaintiffs have satisfied the provisions of Rule 23. *Falcon,* 457 U.S. at 160, 102 S.Ct. 2364.

### B. Requirements for Class Certification

Fed.R.Civ.P. 23(a) sets forth the requirements for class certification:

> One or more members of a class may sue or be sued as representative parties on

behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

In addition to the requirements of Fed. R.Civ.P. 23(a), the class sought must also satisfy one of the three elements of Rule 23(b). Fed.R.Civ.P. 23(b); *Visa Check*, 280 F.3d at 133. In this case, Plaintiffs seek certification under subsection (3) of Rule 23(b). Fed.R.Civ.P. 23(b)(3) permits class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### 1. Federal Rule of Civil Procedure 23(a)

In the case at bar, Plaintiffs meet all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation.

#### a. Numerosity

■ A member of a class may sue on behalf of all class members only if "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). During the class certification stage, the plaintiff or plaintiffs need not prove the exact number of individuals constituting the class, only that the class is so numerous that joinder of potential plaintiffs would be difficult or inconvenient. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993); *Pecere*, 194 F.R.D. at 70 (citations omitted). Factors in determining impracticality of joinder include: judicial economy achieved from the avoidance of multiple concurrent actions; the geographic dispersion of members of the class; the relative financial resources of the class members; the ability of claimants to institute individual ac-

tions; and any requests for prospective or injunctive relief affecting future class members. 5 *Moore's Federal Practice*, § 23.22[2] (Matthew Bender 3d ed.).

The Federal Rules do not outline rigid standards for determining numerosity. In this Circuit, courts have certified classes with a varying range of members. *E.g.*, *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) ("numerosity is presumed at a level of 40 members"); *Mathis v. Bess*, 138 F.R.D. 390, 393 (S.D.N.Y.1991) (certifying a class of 120 members); *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 40–41 (S.D.N.Y.1990) (numerosity requirement met for a class numbering 36); *Finnan v. L.F. Rothschild & Co., Inc.*, 726 F.Supp. 460, 465 (S.D.N.Y.1989) (joinder of 127 plaintiffs is impracticable).

■ In their motion papers, Plaintiffs do not indicate the exact size of the potential class in this action. However, Plaintiffs contend there are likely over three hundred (300) lobstermen who may qualify for inclusion in this class. Although all members of the potential class could assumedly be identified through the records of lobster licenses maintained by the States of New York and Connecticut, Plaintiffs are not required to provide an exact number of class members at the class certification stage. *LeGrand v. New York City Transit Authority*, 1999 WL 342286, at *3 (E.D.N.Y. May 26, 1999) (Gleeson, J.) ("[P]laintiffs need not provide a precise quantification of their class, since a court may make 'common sense assumptions' to support a finding of numerosity") (citations omitted); *Robidoux*, 987 F.2d at 935; *Pecere*, 194 F.R.D. at 70 (citations omitted). However, given that the burden to prove numerosity is on the party moving for class certification, Plaintiffs must show some reasonable estimate of the number of potential class members. *LeGrand*, 1999 WL 342286, at *3 (citations omitted). Plaintiffs succeed in meeting the requirement of Rule 23(a)(1) by showing that the class contains a large number of potential members. A class of over 300 members clearly meets the standards for numerosity set out by courts in this Circuit.

Defendants proffer several arguments as to why Plaintiffs fail to meet the numerosity requirement of Rule 23(a), however none are appropriate at this stage in the litigation. Defendants contend, *inter alia,* that certain facts make a determination of liability and damages impossible: some lobstermen work full-time and some work part-time; there are varying fishing customs and techniques used by potential class members; and the bottom of Long Island Sound varies considerably from location to location. Defendants go on to argue that there is no evidence showing why joinder is impracticable. However, as courts in this Circuit have clearly indicated, a plaintiff's allegations must be treated as true when determining whether class certification is appropriate. *Pecere,* 194 F.R.D. at 69 (citing *Eisen,* 417 U.S. at 177, 94 S.Ct. 2140); *Indus. Diamonds Antitrust Litig.,* 167 F.R.D. at 378 (citations omitted). Plaintiffs claim that the potential class in this case includes over three hundred (300) commercial lobstermen in Long Island Sound. It would be impracticable to join that number of plaintiffs into one action, and, in the interest of judicial economy alone, it seems to this Court a perfect instance to proceed with a class action, assuming, *arguendo,* Plaintiffs meet the other requirements for class certification.

Alternatively, Defendants claim that even if Plaintiffs meet the numerosity requirement in terms of number of lobstermen who suffered damages in the operative period, Plaintiffs fail to establish that a sufficient number of those putative class members individually maintain claims over $75,000, as required by 28 U.S.C. § 1332.

Diversity jurisdiction extends to civil actions in which the amount-in-controversy exceeds $75,000, assuming the parties meet citizenship requirements. 28 U.S.C. § 1332. In diversity class actions, the Supreme Court held in *Snyder v. Harris* that plaintiffs may aggregate their claims to satisfy the amount-in-controversy requirement only if they have a common and undivided interest. 394 U.S. 332, 336–337, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). Therefore, class members may not aggregate claims that are separate and distinct. *Id.; Mehlenbacher v. Akzo Nobel Salt, Inc.,* 216 F.3d 291, 296–297 (2d Cir.2000).

However, the *Snyder* Court did not resolve the question of whether plaintiffs whose claims fail to meet the amount-in-controversy threshold may nonetheless enter a class action pursuant to the doctrine of ancillary jurisdiction, assuming claims of the class representatives satisfy the $75,000 requirement. The paramount case concerning aggregation of claims in class actions is *Zahn v. International Paper Co.,* in which the Supreme Court held that *all* class members, not just the named representatives, must satisfy jurisdictional amount. 414 U.S. 291, 301, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). Thus, according to Supreme Court precedent, supplemental jurisdiction may not be exercised over those class members' claims that fail to satisfy the amount-in-controversy requirement. *See id.* at 300–301, 94 S.Ct. 505.

The continuing viability of *Zahn* has been a matter of much debate since Congress enacted the supplemental jurisdiction statute (28 U.S.C. § 1367) in 1990.[9] The circuits are split over whether *Zahn* remains good law. Some Circuits—namely the Fourth, Fifth, Seventh, and Ninth Circuits—have found that the supplemental jurisdiction statute tacitly overrules Zahn, because the text of Section 1367 clearly fails to list Rule 23 class actions as an exception in subsection (b). *See In re Abbott Labs.,* 51 F.3d 524, 529 (5th Cir.1995), *aff'd by equally divided court,* 529 U.S. 333, 120 S.Ct. 1578, 146 L.Ed.2d 306 (2000); *Rosmer v. Pfizer, Inc.,* 263 F.3d 110, 114–119 (4th Cir.2001), *rehearing en banc denied,* 272 F.3d 243 (4th Cir.2001), *cert. dismissed,* —— U.S. ——, 123 S.Ct. 14, 153 L.Ed.2d 878 (2002); *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 607 (7th Cir.1997); *Gibson v. Chrysler*

---

**9.** Section 1367 grants supplemental jurisdiction to district courts over all related claims within the original jurisdiction of the court. 28 U.S.C. § 1367(a). This jurisdiction extends to claims involving the "joinder or intervention of additional parties." *Id.* Section 1367(b) lists certain exceptions to subsection (a)'s grant of supplemental jurisdiction, however Rule 23 is not mentioned as one of the enumerated departures from the general rule of expansive supplemental jurisdiction.

*Corp.,* 261 F.3d 927, 933–940 (9th Cir.2001). By contrast, other Circuits—notably the Third, Eighth, and Tenth Circuits—in holding that *Zahn* remains good law, have looked to the legislative history of § 1367, which seems to indicate Congress did not intend *Zahn* to be overruled by the supplemental jurisdiction statute. *See Meritcare, Inc. v. St. Paul Mercury Ins. Co.,* 166 F.3d 214, 218–222 (3d Cir.1999); *Trimble v. Asarco, Inc.,* 232 F.3d 946, 960–962 (8th Cir.2000); *Leonhardt v. Western Sugar Co.,* 160 F.3d 631, 637–641 (10th Cir.1998).

As of yet, the Supreme Court has not resolved the issue. To further complicate matters, the Second Circuit "has not spoken as to the continuing viability of *Zahn* after the enactment of § 1367." *Mehlenbacher,* 216 F.3d at 297; *see also E.R. Squibb & Sons v. Accident & Cas. Ins. Co.,* 160 F.3d 925, 934–935 (2d Cir.1998) (recognizing disagreement but declining to rule on the issue); *In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 166 F.Supp.2d 740, 753 (E.D.N.Y.2001) (Trager, J.). Although the Second Circuit has yet to rule on this incongruity, "every district court in this circuit that has addressed the issue has held that *Zahn* is still good law." *Freeman v. Great Lakes Energy Partners, L.L.C.,* 144 F.Supp.2d 201, 210 (W.D.N.Y.2001); *see also Mehlenbacher v. Akzo Nobel Salt,* 207 F.Supp.2d 71, 82 (W.D.N.Y.2002) (citations omitted); *Ciprofloxacin,* 166 F.Supp.2d at 755 ("[A] finding that *Zahn* is not overruled by Section 1367 is consistent with the vast weight of authority in this Circuit") (citations omitted).

In their motion for class certification, Plaintiffs alleged that the putative class contains approximately three hundred (300) lobstermen. The number of potential class members suffering over $75,000 in damages was apparently amended, however, by the Dyer Affidavit submitted by Plaintiffs at the request of this Court. Dyer, an expert in natural resource management, testified "that there are over one-hundred (100) commercial lobstermen in New York and Connecticut who trap lobsters in the Long Island Sound

that sustained economic or pecuniary damages in excess of $75,000." (Dyer Aff. ¶ 13.) [10]

Defendants attack the Dyer affidavit on various grounds, including, *inter alia:* (1) Dyer never stated that the alleged damages suffered by the putative class members accrued during the operative period, namely after mid-September 1999; (2) Dyer's methods were not properly documented in the affidavit; (3) Dyer's methodology of surveying lobstermen was not an adequate procedure for measuring potential damages; and (4) Defendants' own expert, Tillman, outlined methods that would garner more accurate information regarding alleged damages.

■ Although Defendants take issue with the methodology and findings of the Dyer Affidavit, Plaintiffs' burden of proving damages over the jurisdictional minimum is *de minimis. See St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–289, 58 S.Ct. 586, 82 L.Ed. 845 (1938) (establishing the "legal certainty" test whereby it must appear to a legal certainty that the claim asserted is for less than the jurisdictional minimum to justify dismissal); *see also Wolde Meskel v. Vocational Instruction Project Cmty. Servs., Inc.,* 166 F.3d 59, 63 (2d Cir.1999). When a plaintiff is the party asserting federal jurisdiction, "the plaintiff must establish merely that it does *not* appear to a legal certainty that the claim is *below* the jurisdictional minimum." 15 *Moore's Federal Practice,* § 102.106[1] (Matthew Bender 3d ed.) (emphasis in original). In this case, Plaintiffs have produced sufficient evidence to meet the requirements of the legal certainty test, supported by competent proof. *See United Food Local 919 v. CenterMark Props.,* 30 F.3d 298, 304–306 (2d Cir. 1994); *Wolde–Meskel,* 166 F.3d at 63.

Under *Zahn,* every class member—each named plaintiff and each putative class member—must individually satisfy the $75,000 threshold. 414 U.S. at 300–301, 94 S.Ct. 505. Defendants argue that the broad class for which Plaintiffs seek certification includes approximately 1200 licensed lobstermen.

---

**10.** It is clear from Plaintiffs' motion papers that all three named Plaintiffs meet the $75,000 juris-

dictional requirement.

Defendants apparently arrived at this figure by looking to the number of individuals holding lobstering licenses in New York and Connecticut during the operable period. Thus, according to Defendants, nearly 1100 members of the class as defined by Plaintiffs fail to individually satisfy the jurisdictional minimum. When deciding a motion for class certification, courts must treat as true all allegations contained in the complaint. *Pecere*, 194 F.R.D. at 69. However, courts may go beyond the pleadings in order to determine whether the plaintiffs have satisfied the provisions of Rule 23. *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364. In Plaintiffs' motion papers, they allege a potential class of approximately 300 lobstermen, which accounts for those individuals who were licensed to catch lobsters in New York and/or Connecticut during the operable period and who earned a substantial portion of their livelihood from trapping and selling lobsters. This figure may be relied on by this Court as a good faith estimate by Plaintiffs of the number of potential class members. *See Robidoux*, 987 F.2d at 935 (holding plaintiffs are not required to provide evidence of exact class size of class); *Jackson v. Foley*, 156 F.R.D. 538, 541–542 (E.D.N.Y.1994) (Johnson, J.) (finding a good faith estimate of class size is sufficient).

Furthermore, a court may redefine a class or create subclasses at any point in the proceedings. Fed.R.Civ.P. 23(c)(4); *see also Boucher v. Syracuse Univ.*, 164 F.3d 113, 118

(2d Cir.1999) (citations omitted). Therefore, if and when it becomes necessary to address the issue of overbreadth, this Court may certify a subclass composed of those lobstermen who suffered more than $75,000 in damages as a result of the depletion of the lobster population beginning in September 1999.

 Although the number provided in the Dyer Affidavit is less than the putative class of 300 originally asserted by Plaintiffs, the lesser number of 100 clearly meets the requirements for numerosity in this Circuit. Whether *Zahn* remains the rule in this Circuit is uncertain. If § 1367 effectively overrules *Zahn*, this Court may exercise its discretion to assert supplemental jurisdiction over the claims of all class members, even those who fail to meet the amount-in-controversy threshold. However, even if *Zahn* remains good law, which is the more likely alternative according the multitude of district court cases cited *supra*, Plaintiffs have sufficiently alleged a large enough number of potential class members (over 100) to make joinder impracticable.[11]

For the foregoing reasons, Plaintiffs have met the standard for numerosity under Rule 23(a).

**b. Common Questions of Law or Fact**

 The second requirement of Fed. R.Civ.P. 23(a) is commonality. "The commonality requirement is met if plaintiffs'

---

11. This Court acknowledges the inherent conundrum resulting from a forced determination of damages suffered by class members who have yet to be identified. A class consisting of unnamed and yet to be ascertained individuals, as in the case at bar, poses a problem for courts attempting to discern whether all class members meet the *amount-in-controversy requirement*. Perhaps this difficulty, in addition to the plain language argument posited by the Fifth Circuit in *Abbott Labs.*, 51 F.3d at 527–528, serves to bolster an interpretation in this Circuit that Section 1367 *should* be read to overrule *Zahn*. In a class action brought on diversity grounds, courts consider only the citizenship of the named plaintiffs for jurisdictional purposes. *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 162 (2d Cir. 1987). Perhaps it would be prudent to implement a similar approach for determining whether plaintiffs have met the amount-in-controversy requirement, given the nearly impossible task

confronting district courts forced to determine damages suffered by class members who have yet to be identified. *E.g., Gibson*, 261 F.3d at 941.

As applied to the instant action, this Court must find that Plaintiffs, by providing an affidavit of an authority in environmental resource management attesting to the likelihood of numerous class members suffering over $75,000 in damages, have met their *de minimis* burden. If this were not the case, it would be virtually impossible for any class action brought in those circuits following *Zahn* to contain unnamed class members. The liberal interpretation of the legal certainty test employed herein by this Court is a necessity stemming from the inherently impossible endeavor of determining damages for plaintiffs who have not yet been identified. If this Circuit chooses to follow Zahn, this liberal standard seems the only option for addressing such actions where members of the class are not yet ascertained.

grievances share a common question of law or of fact." *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (citations omitted). Rule 23(a)(2) does not mandate that the plaintiff or plaintiffs demonstrate that all class members' claims are identical. *Caridad,* 191 F.3d at 293; *Maneely v. City of Newburgh,* 208 F.R.D. 69, 74 (S.D.N.Y.2002). This requirement is satisfied as long as the class shares at least one common question of law or fact. *Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 150 (E.D.N.Y.1996) (Spatt, J.). Further, factual differences in the claims of the class do not automatically preclude a finding of commonality. *See Marisol A.,* 126 F.3d at 377; 5 *Moore's Federal Practice,* § 23.23[2] (Matthew Bender 3d ed.). In fact, plaintiffs may meet the commonality requirement where the individual circumstances of class members differ, but "their injuries derive from a unitary course of conduct by a single system." *Marisol A.,* 126 F.3d at 377.

█ Defendants contend that Plaintiffs' claims are based upon the alleged application of different pesticides in different areas under different conditions over a period of more than a month. Defendants argue that there is no common factual or legal basis for this proposed class and that "case-wide harm caused by identifiable products is not present." (Defs.' Opp'n at 59.)

On the contrary, there are many common questions of law and fact that Plaintiffs, and potential class members, share. These parallel questions include, *inter alia:* (1) the ways in which commercial lobstermen in Long Island Sound caught lobsters prior to 1999; (2) how the September 1999 die-off affected the productivity of the fishery as a whole; (3) what pesticides entered the waters of Long Island Sound; (4) how the pesticides entered the waters of Long Island Sound; (5) whether the pesticides caused or contributed to lobster mortalities; and (6) whether Defendants were negligent in their design, testing, manufacture, storage, distribution, transportation, or entrustment to others of the pesticides.

█ Furthermore, Defendants' claim that Plaintiffs have not established commonality because they have failed to prove a uniform harm resulting from the application of Defendants' products is an argument that should be reserved for trial. It is well-established that "a motion for class certification is not an occasion for examination of the merits of the case." *Caridad,* 191 F.3d at 291 (citing *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 570–572 (2d Cir.1982)); *see also Eisen,* 417 U.S. at 177–178, 94 S.Ct. 2140. Essentially, Defendants argue that Plaintiffs' motion should fail because Plaintiffs' claims fail on the merits. The merits of Plaintiffs' case it not at issue in the instant motion.

█ For the foregoing reasons, Plaintiffs have met the requirements pursuant to Rule 23(a)(2).[12]

#### c. Typicality

█ The third requirement of Fed. R.Civ.P. 23(a)—typicality—"requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A.,* 126 F.3d at 376 (quoting *In re Drexel Burnham Lambert Group,* 960 F.2d 285, 291 (2d Cir. 1992)). Typicality is satisfied if the claims of the class representatives arise from the same set of events or conduct and if the claims are based upon the same legal theory as those of the other members of the class. *Drexel Burnham,* 960 F.2d at 291; *see also In re Frontier Ins. Group, Inc. Secs. Litig.,* 172 F.R.D. 31, 40–41 (E.D.N.Y.1997) (Nickerson, J.); 5 *Moore's Federal Practice,* § 23.24[2] (Matthew Bender 3d ed.).

---

12. Where plaintiffs seek certification under Fed. R.Civ.P. 23(b)(3), as Plaintiffs do here, the "'commonality' requirement is subsumed under, or superceded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citing *Georgine v. Amchem Prods.,* 83 F.3d 610, 627 (3d Cir.1996)); *see also Visa Check,* 280 F.3d at 136 n. 6. Therefore, a discussion of whether individual issues overwhelm questions common to the class is reserved for the predominance inquiry under Rule 23(b)(3), *infra.*

Like the test for commonality, the typicality requirement does not mandate that the named representatives have completely identical claims to all other class members. *Caridad*, 191 F.3d at 293; *Robidoux*, 987 F.2d at 936–937 (holding minor factual differences do not defeat typicality). In fact, differences in damages are not a bar to typicality. *Trautz v. Weisman*, 846 F.Supp. 1160, 1167 (S.D.N.Y.1994); 5 *Moore's Federal Practice*, § 23.24[5] (Matthew Bender 3d ed.). Rather, the claims of the named plaintiffs need only arise from the same events or conduct as the rest of the class. *Marisol A.*, 126 F.3d at 376. This is clearly the case here. The claims of the class representatives, like the potential class members, are predicated upon the massive lobster mortality beginning in September 1999 allegedly caused by the presence in Long Island Sound of various pesticides manufactured by Defendants. Furthermore, the three named Plaintiffs broadly represent the geographic spectrum of Long Island Sound, the method of fishing generally employed by Long Island Sound lobstermen, and the extent to which they have been harmed by the mass lobster mortality.

Defendants claim that the named Plaintiffs are not, and cannot be, typical of the proposed class, given the various applications of different pesticides in different areas at different times under different conditions. Contrary to Defendants' assertions, there are numerous factual and legal issues that are common to the entire class of claimants. The named Plaintiffs share these common characteristics with the class itself.

Therefore, Plaintiffs have the met the requirements for typicality pursuant to Rule 23(a)(3).

### d. Adequate Representation

In order to satisfy Rule 23(a)(4), Plaintiffs must show that the proposed representative parties "will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). Adequate representation is a twofold requirement: class counsel must be qualified and able to conduct the proposed litigation, and the class representatives must not have interests antagonistic to those of the

other class members. *Drexel Burnham*, 960 F.2d at 291; 5 *Moore's Federal Practice*, § 23.25[3][a] (Matthew Bender 3d ed.).

Here, Defendants do not dispute that Plaintiffs' counsel are qualified and experienced in conducting this type of class litigation. However, pursuant to Rule 23(a)(4), Plaintiffs are also required to show that potential class representatives share the desire to vigorously prosecute the action and have no interests that are antagonistic to proposed class members. *See Drexel Burnham*, 960 F.2d at 291. Defendants assert that Plaintiffs fail to meet this requirement due to an "irreconcilable conflict of interest that exists among members of the proposed class." (Defs.' Opp'n at 61.) In furtherance of this claim, Defendants contend that Long Island Sound contains a bottom that is not uniform. Specifically, there are areas that contain a muddy bottom, some that have a sandy bottom, and some that have a rocky bottom. The three named Plaintiffs each fish in a different area of Long Island Sound. Defendants argue that these differences produces an inherent conflict within the class, given that those class members who trap lobsters in the most ideal bottom of the Sound would suffer more damage than those members fishing from a less ideal bottom.

Once again, Defendants confuse the issue of damages with Plaintiffs' required showing for class certification. A potential difference in the damages awarded to class members is not a bar to class certification. *Visa Check*, 280 F.3d at 139 (citations omitted). Moreover, in order for a conflict to cause a finding of inadequacy as to the named representatives, the conflict must be more than merely speculative or hypothetical. *See Becher*, 164 F.R.D. at 152–153. In this case, Plaintiffs contend that the named representatives have and will appear voluntarily to all proceedings and that they will not act in a manner contrary to the class members.

Therefore, Plaintiffs have met the requirements pursuant to Rule 23(a)(4).

### 2. Federal Rule of Civil Procedure 23(b)(3)

A court may certify a class pursuant to Rule 23(b)(3) if "the court finds that the

questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Therefore, Plaintiffs must prove both predominance and superiority to succeed in asserting a claim for class certification under Rule 23(b)(3).

### a. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231. The question of predominance focuses on the number and significance of common questions present in the class as a whole, as opposed to any individual issues pertaining to particular plaintiffs. 5 *Moore's Federal Practice*, § 23.44 (Matthew Bender 3d ed.). "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some issues as to individualized damages." *Visa Check*, 280 F.3d at 139 (citations omitted). " '[A]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [a defense] will not automatically foreclose class certification under Rule 23(b)(3).' " *Id.* at 138 (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000)).

Defendants contend that because this case involves a mass tort, class certification is inappropriate. The comments to Rule 23(b)(3) explicitly caution against class certification in mass tort cases. Advisory Committee Notes on 1966 Revision of Rule 23(b)(3) ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways."). In fact, many courts have denied certification in actions involving mass torts. *See Agent Orange*, 818 F.2d at 164 (citations omitted).

Defendants argue that in this case, like most mass tort actions, "[i]ndividual issues of causation and injury overwhelm any remaining common issues." (Defs.' Opp'n at 65.) Defendants further assert that the case at bar contains many of the same qualities present in *Amchem Prods., Inc. v. Windsor*, the leading case regarding class certification in mass tort actions, where the Supreme Court expressed reluctance in certifying the proposed class. 521 U.S. at 622–628, 117 S.Ct. 2231. In *Amchem*, the Court addressed a challenge to class certification for settlement purposes in an asbestos litigation. The Court held that a class including individuals who were presently injured, as well as individuals who had only been exposed to asbestos, was improperly certified under Fed. R.Civ.P. 23(a) and (b). *Id.* Furthermore, the Court found no predominance pursuant to Rule 23(b)(3), given the sprawling nature of the class. *Id.* at 624–625, 117 S.Ct. 2231. The Court stated: "In contrast to mass torts involving a single accident, class members in this case were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time; some suffered no physical injury, others suffered disabling or deadly diseases." *Id.* at 609, 117 S.Ct. 2231. Defendants repeat this language from *Amchem* continuously throughout their motion papers and attempt to draw a parallel between the proposed class in the case at bar and the class in *Amchem*.

This Court disagrees with Defendants' application of *Amchem* to the facts of this case. In *Amchem*, the class encompassed an extraordinarily large range of diseases, individualized medical treatments, and exacerbating factors.

> Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma...Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.

> The [exposure-only] plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will

contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories.

*Id.* at 624, 117 S.Ct. 2231 (quoting *Georgine,* 83 F.3d at 626) (internal quotation marks omitted).

Defendants contend that even if the commonality requirement is satisfied pursuant to Rule 23(a), the predominance criterion is far more demanding. *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002) (citing *Amchem,* 521 U.S. at 623–624, 117 S.Ct. 2231). Therefore, the common issues enabling Plaintiffs to satisfy their burden under Rule 23(a)(2) do not necessarily meet the requirements for predominance under 23(b)(3). In the instant case, however, there are enough sufficient common issues that predominate over questions affecting only individual members to satisfy 23(b)(3).

Plaintiffs claim that the individual issues in this case are limited to questions of damages, and each Plaintiffs' claim contains common questions shared by all members of the proposed class. These common issues include, *inter alia:* causation; the environmental fate and effect of the pesticides on aquatic invertebrates, such as lobsters; and the extent of both long-term and short-term harm to the fishery of Long Island Sound.

The main issue in this action is one of causation: did the pesticides manufactured by Defendants cause the lobster mortalities? Plaintiffs assert that causation alone meets the test for predominance. The question of causation is common to all class members, such that all lobstermen experienced a depletion of the lobster population. There are different pesticides at issue and a question of which, if any, caused the lobster to die. Specific issues of causation should be left for trial and are not appropriate for courts to consider during class certification. *See Eisen,* 417 U.S. at 178, 94 S.Ct. 2140 (holding class certification is not the appropriate forum to consider the merits of the case). In addition, this class is far less sprawling than the one in *Amchem,* because it is limited to those fishermen who had commercial lobes-tering licenses in September 1999 and suffered legally cognizable harm.

Further, the Supreme Court in *Amchem* qualified its own ruling by stating that "[e]ven mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement...[T]he text of the rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970s, have been certifying such cases in increasing number." 521 U.S. at 625, 117 S.Ct. 2231. Therefore, *Amchem* does not unconditionally bar mass torts from class certification as Defendants assert.

Plaintiffs argue, and this Court agrees, that the massive lobster die-off commencing in mid-September 1999 is analogous to a single catastrophic event, such as an airplane crash, rather than a typical mass tort, the cause of which may last over an extended period of time. Plaintiffs' claims are not founded upon the long-term exposure to products, as is true in asbestos or pharmaceutical cases. Instead, the facts of the instant action involve the relatively short application of pesticides in and around the area of Long Island Sound during September and October 1999. Many mass tort cases in which courts have denied class certification involved putative class members suffering varying types of damages at different times through different causal mechanism. *See Agent Orange,* 818 F.2d at 164–165 (citations omitted). That is not the case here. This action involves damage to the lobster population occurring in a short time frame concurrent with the application of pesticides manufactured by Defendants. All potential class members suffered losses as a result of the massive lobster mortality, the cause of which Plaintiffs allege to have resulted from the same causal mechanism, i.e., exposure to one or more pesticides sprayed to combat the West Nile Virus in September and October 1999. Therefore, this Court agrees with Plaintiffs' contention that Rule 23(b)(3)'s predominance requirement is satisfied given that the cause of action generally arises from one set of operative facts.

In addition, the fact that Defendants assert common defenses is contrary to their argument against predominance. To illustrate, this Circuit has found class certification justified, pursuant to both Rule 23(a)(3) and 23(b)(3), in a suit by servicemen and their relatives against the manufacturers of dioxin (Agent Orange), even given the individualized nature of the plaintiffs' causation and damages claims, due in part to the centrality of the defense proffered by the defendants. *Agent Orange*, 818 F.2d at 166–167; Fed. R.Civ.P. 23(a)(3) ("A class action may be maintained where the claims *or defenses* of the representative parties are typical of the claims of defenses of the class") (emphasis added). Similarly, in the case at bar, there are several affirmative defenses Defendants have raised, including, *inter alia:* (1) an argument for preemption under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, *et seq.;* (2) a claim that primary jurisdiction lies with the United States Environmental Protection Agency; (3) the governmental emergency doctrine; (4) the learned intermediary defense; (5) the "state of the art" defense; and (6) the fault of third parties.

■■■ Defendants further argue that the calculation of individualized damages makes this case unmanageable as a class action. This Court does not agree with that contention. As this Circuit has explained:

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Visa Check*, 280 F.3d at 141 (citations omitted). A potential difference in the damages among class members is not necessarily a bar to class certification. *Id.* at 139 (citations omitted).

Thus, given the forgoing, Plaintiffs have met the requirements of predominance under Rule 23(b)(3).

### b. Superiority

■■■ The superiority prong of Fed. R.Civ.P. 23(b)(3) requires that a class action be the most favored form of litigation, according to the facts. Factors relevant to the superiority of a class action include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Although these criteria are not exhaustive, *Amchem*, 521 U.S. at 615–616, 117 S.Ct. 2231, they provide guidance for this Court's analysis of the superiority issue.

■■■ It is important to consider the concept of judicial economy when determining whether a class action would be preferable to multiple separate litigations. One factor courts consider is the size of the proposed class—the larger the class, the more judicial resources would be saved by proceeding as a class action. *E.g., Cromer Finance Ltd. v. Berger*, 205 F.R.D. 113, 133 (S.D.N.Y.2001); *see also* Fed.R.Civ.P. 23(a)(1). In addition, the more similar the claims of the potential class members, the less sense it makes to litigate repetitious individual actions. *See Epifano v. Boardroom Bus. Prods.*, 130 F.R.D. 295, 299 (S.D.N.Y.1990). A class action is the superior method of resolving liability issues when litigation by each individual plaintiff "would risk disparate results among those seeking redress, . . . would exponentially increase the costs of litigation for all; and would be a particularly inefficient use of judicial resources." *Cromer*, 205 F.R.D. at 133.

Plaintiffs assert that if this matter is not certified as a class action, the majority of lobstermen making up the proposed class will

likely not pursue separate actions against Defendants. The lack of parallel litigation speaks to the fact that this action has the potential to resolve a multitude of related claims, thereby preserving judicial resources and promoting a global resolution of this matter. Finally, there is little danger of management difficulties given that the applicable class of claimants is specifically limited to licensed commercial lobstermen, and there is no risk that persons not holding licenses will attempt to join the class.

Therefore, due mainly to issues of judicial economy, this Court finds that class certification is the superior manner by which to proceed with this litigation.

### CONCLUSION

Accordingly, for the foregoing reasons, Plaintiffs' Motion for Class Certification must be, and the same hereby is, GRANTED. The class definition proposed by Plaintiffs is accepted by this Court, with minor changes for the sake of clarification. The following class is hereby certified:

> All persons or other legal entities that possess or possessed a valid commercial fishing license or licenses issued by the State of New York and/or the State of Connecticut which permitted them to catch and take lobsters (*homarus americanus*) from the waters of the Long Island Sound within the territories of the State of Connecticut and/or the State of New York for commercial purposes or for purposes of sale, and who, beginning in September 1999, suffered or sustained legally cognizable damages or suffered a legally cognizable harm as a result of the application of insecticides (adulticides or larvicides manufactured by the defendants to this lawsuit) in the State of New York and the State of Connecticut that began in September 1999.

SO ORDERED.